DONALD MICHALEK *et al.*, Plaintiffs-Appellants, *v.* THE VILLAGE OF MIDLOTHIAN *et al.*, Defendants-Appellees.

First District (5th Division)   No. 82—2263

Opinion filed July 22, 1983.

Vincent J. Getzendanner, Jr., and David A. Upah, both of Madigan, Stanner, Kahn, Bonifacic & Getzendanner, of Chicago, for appellants.

John R. Sullivan, of Midlothian, for appellees.

JUSTICE SULLIVAN delivered the opinion of the court:

This appeal is from a judgment for defendants in an action to declare a zoning classification of the village of Midlothian (Village) unreasonable and invalid as applied to plaintiffs' property. Plaintiffs contend that (1) the findings of the trial court are against the manifest weight of the evidence; and (2) the trial court erred in admitting evidence of the Village building code, fire code, and subdivisions ordinances.

Plaintiffs own a vacant four-acre tract of land, currently zoned for single-family use, northwest of the intersection of 147th Street and Cicero Avenue in the Village. It is bounded on the east by Lamon Avenue, on the south by 145th Street, on the west by the Midlothian Country Club (Club) and on the north by a gravel driveway leading to a home situated opposite the northwest corner of the subject property. There are no streets north or west of the property, although there is a 33-foot right-of-way dedicated for Lavergne Avenue along its western boundary with the Club. Lamon Avenue is a fully developed street on a 66-foot right-of-way from 147th to 145th Street, but narrows to 16 to 18 feet of pavement on a 33-foot dedication abutting the eastern boundary of the subject property. Similarly, 145th Street is a fully improved roadway for one block between Cicero and Lamon, but narrows to 15 feet of pavement on a 33-foot right-of-way along the south line of plaintiffs' property. All of the property between Lamon Avenue

and the Club, and from 147th to 143rd Streets, is zoned for single-family use. Property on the east side of Lamon Avenue, from 147th to 144th Streets, is zoned for multiple-family use and abuts property along Cicero Avenue zoned for commercial use. A triangular, 17-acre portion of the Club is zoned for multiple-family use, and the southeast portion of that area adjoins plaintiffs' property on the west.

On May 3, 1980, plaintiffs petitioned the Village for rezoning of their property for multiple-family use. After a hearing, the Village zoning board recommended that rezoning be denied, and the Village board adopted that recommendation. Plaintiffs then filed this action seeking a declaration that the present zoning is arbitrary and unreasonable in that it bears no reasonable relation to public health, safety, or welfare.

At trial, Donald Michalek testified that his parents purchased the subject property in 1954. Three years later, his mother built a home on the southeast corner of the property which is currently owned and occupied by his brother and is not part of the subject property. In 1973, he and his brother inherited the property, which has always been zoned for single-family use. He purchased his brother's interest in 1979 with the intention of developing the property for multiple-family use. The land was never offered or advertised for sale or listed with a broker, and no offers were received to develop it. At the time he filed for rezoning, the property to the east and west was vacant but zoned for multiple-family use. There are several six- and 12-unit apartment buildings southeast of the property on the east side of La-mon Avenue, bordered by the commercial property along Cicero. He acknowledged that the development plan attached to his complaint was not submitted to the Village when rezoning was requested. The streets east and south of the subject property are half-streets, but his proposed plan has no dedication to allow completion of Lamon or 145th Street or to construct a road north of the property. A number of new homes have been built in recent years south of 145th Street between Lavergne and Lamon. All of the land surrounding the subject property is currently vacant or developed for single-family use.

Rolf Campbell, an expert in land planning and zoning, testified that he examined the area in early 1981 at plaintiffs' request to determine the suitability of the subject property for multiple-family development. The existing streets south and east of the property and the dedication for the right-of-way on the west are half-dedications; only the west dedication was taken from the subject property. The portion of the Club adjacent to the plaintiffs' property is zoned for multiple-family use, as is the property to the east. The area south of the sub-

ject property is developed for single-family use, but the majority of the property to the north, although zoned for residential use, is vacant, and an area northeast of the subject property was recently rezoned from single-family to multiple-family use. The subject property as well as the property to the north should be rezoned, forming a corridor of multiple-family zoning from Cicero to the Club parcel. The character of the area is a mixture of commercial, multiple-family, and single-family use, with the site in question most closely related in proximity and condition to the multiple-family trend of development. Although the property is suitable for single-family development, it would be underutilized, since such development would result in only 12 to 16 living units. The major trend in the area is multiple-family in both zoning and use, as evidenced by the fact that more multiple-family than single-family units have been constructed recently, and the demand for multiple-family housing in the general area is currently stronger than that for single-family. Plaintiffs plan to construct seven four-story buildings with parking underneath. The buildings would face inward to a central landscaped area, and open parking would be provided on the perimeter of the buildings in order to put additional space between the apartments and the existing single-family residences to the south. Each building would have 16 units for a total of 112, or 27 units per acre, which is much less than the 48 per acre allowed by multiple-family zoning but is still considered medium to high density. Access to the buildings would be at the northeast corner from Lamon and the southwest corner from Lavergne. To protect the character of the homes on the south, 145th Street should remain a half-street, and the subject property bermed and landscaped along its southern boundary. The other streets in the area are adequate as they exist to handle the traffic generated by the proposed plan. Under this plan, 55% of the property will consist of green areas, while 25% will be covered by buildings and 20% by open parking and drives. A tax and school impact study indicates that the proposed development will generate $15,000 in tax revenues for the Village and $143,000 for the area schools, which exceeds the cost of educating children expected to reside in the development. The highest and best use of the subject property would be development for multiple-family use substantially in accord with the proposed plan.

Campbell admitted that he did not know whether the plan was in compliance with the Village building code, or if the water and sewer systems were adequate for the development proposed. Unless roads in the area are further developed, the only feasible access to the property is at the northeast corner. In determining the trend of develop-

ment, he did not examine building permits recently issued by the Village, but based his opinion on the apparent age of buildings in the area. The multiple-family zoning on the east side of Lamon forms a buffer between the commercial use on Cicero and the single-family area, which is a standard zoning pattern. The parking areas of the proposed development will have lights, and headlights from cars traveling north through the parking lot will shine on the existing home situated on the northwest boundary of the subject property. Single-family zoning for the property is not unreasonable, but that is not its highest and best use. In fact, single-family zoning is reasonable in all ways, but rezoning would be more profitable for the owner and generate more taxes for the Village and schools. Campbell admitted that there is a need for single-family residences in the area, and existing residences might be more marketable if no rezoning occurs. In the proposed plan, one building will be five feet from the lot line of the single-family residence owned by plaintiff's brother. The property is most influenced by the land to the east and west, even though its north and south boundaries are longer.

Joseph Zgonina, a traffic engineer, testified for plaintiffs that the street system adjacent to the subject property is classified as minor residential, and is adequate for the type of development planned without any improvements. There is direct access to the property from Lamon, 145th Street, and Laport Avenue, and further access could be provided by removing a barricade currently blocking Lavergne Avenue at 145th Street. There is presently very little traffic along these streets, and the proposed plan would generate 56 additional traffic movements during peak morning hours and 67 during peak periods in the evening. Most of the traffic would use Cicero Avenue, and could enter the subject property by traveling west on 145th Street from Cicero, then north on Lamon. This traffic pattern would not adversely affect properties along the route. If the property were developed for single-family use, the existing roadways would be adequate, and the volume of traffic would be less. He admitted that Lamon Avenue and 145th Street would have to be widened to 30 feet of pavement to comply with the Village Code; and that, in studying the area, he was concerned only with what is currently available for access and did not ascertain whether any roads he observed were on public rights-of-way or private property.

William McCann, a real estate appraiser and consultant, testified that he examined the subject property and surrounding area on a number of occasions at plaintiffs' request. The area around the intersection of Cicero Avenue and 147th Street is devoted to commercial

uses, and to the west of this commercial area, principally along the east side of Lamon, the trend of development is multiple-family use. These uses are consistent with current zoning. The character of the area is mixed, with no one use predominating, although the most recent construction has been multiple-family units. The current trend of development in the area is multiple-family, but there are several new single-family homes in the area to the south, including one directly across 145th Street from the subject property. There are presently 102 multiple-family units on the east side of Lamon on just over three acres of land. Those buildings appear to have only two vacancies. The demand for condominium units in the area is good, whereas the demand for single-family homes is substantially down, principally because of high interest rates. If the units in the proposed plan are sold as condominiums, they would probably sell for $75,000 to $90,000. There is a wide range of homes in the area; the fair market value of some would be $250,000 to $300,000, while others are in the $60,000 to $90,000 range. Under current zoning, the fair market value of the subject property is $84,000, based on a reasonable density of 14 lots at a value of $6,000 to $7,000 per lot. If the property is rezoned, it would have a fair market value of $224,000. The highest and best use of the land would be multiple-family development in close conformity with the proposed plan. Such use would be consistent with the land use and zoning patterns that have developed throughout the area, and would not be depreciatory to surrounding property trends or values. The impact on surrounding uses, if any, would be consistent with the impact already experienced in the area by virtue of pre-existing multiple-family use and zoning. There would be no monetary depreciation in the value of homes in close proximity to the subject property. The existing zoning is unreasonable because development of single-family homes would be an unwarranted risk for plaintiffs, given the lack of demand for single-family homes, and the diminution in the value of the property is not warranted by the nature of the surrounding zoning and uses. Conversely, the proposed use is reasonable because the property takes its character from the most recent trend of development in the area, and would generate the highest return for the owners without any adverse or depreciatory effects on nearby residences. McCann acknowledged that in making his determination of the most recent trend of construction, he did not look at building permits issued by the Village, and determined occupancy of existing apartments by visual evidence; *i.e.*, visible furniture or window coverings and the absence of "for rent" signs. He did not check with realtors in the area to ascertain the demand for condominiums or apartments, but

relied on his own experience in the general area of the Village and surrounding communities. In determining the value of the land as zoned, he compiled statistics on 30 lots in Crestwood and Oak Forest; he did not attempt to ascertain the price of lots immediately adjacent to the subject property which were recently sold for single-family development. The zoning of land along the east side of Lamon is similar to buffer-type zoning which occurs in many zoning patterns. The Club parcel which is zoned for multiple-family development is unique in that it is a larger area adjacent to the Club facilities, but it does not have good access.

Paul Box, a traffic engineering consultant, testified for defendants that single-family development of the subject property would generate 15 additional traffic movements in the morning and 18 in the evening; whereas, multiple-family development would generate 67 movements in the morning and 78 in the evening—four times as much traffic as single-family development. The road south of the subject property along the Club is not located on the dedicated right-of-way for Lavergne Avenue, but is on private property belonging to the Club. Even if there were access to this road, its use would not be feasible because of the sharp angle of the intersection. Furthermore, its development as an access would channel traffic through an area of single-family homes, and this would have a detrimental impact on that area. The only other access to the subject property shown on the proposed plan is from Lamon at the northeast corner of the property. This is not a desirable access point, and plaintiffs' plan will add to noise vibration, air pollution, and, potentially, increase the number of accidents, including those involving children. Access could not be planned from 145th Street as it is currently developed, because the pavement is only 15 feet wide and it is almost impossible for moving vehicles to pass each other. The proposed plan is not properly designed or appropriate to the area from a traffic standpoint, since the only feasible routes of traffic are along streets abutted by single-family homes, and the plan does not contain any dedications to improve the inadequate design. Box admitted that street dedications would also be necessary if the property were developed for single-family use. He did not know whether the Village has an official plan concerning land use and zoning, but he had seen zoning and subdivision regulations.

William Metz, a real estate appraiser and consultant retained by defendants, testified that a number of new homes have been built recently in the area south of the subject property, and the demand for single-family homes in the area is high because of its proximity to the golf course and the style and price-range of existing homes, estimated

at $70,000 to $150,000. The demand for multiple-family units in the area is somewhat limited. The proposed plan of 27 units per acre is considered high density and, if the proper street dedications are made, the density will be 35 units per acre, which is within zoning limits. The land as currently zoned has a fair market value of $200,000 if developed into 10 lots for single-family homes. He based his figures on a study of four recent sales of developed lots in the area around the Club. The selling prices for these lots ranged from $28,000 to $45,000. Lots on the subject property would sell for $35,000 if improved and $20,000 if unimproved. Lots in older sections of the Village not in proximity to the Club sell for $5,500 to $8,000. If the land were rezoned for multiple-family use, it would have a fair market value of $225,000. The highest and best use of the property is single-family residential development considering land use patterns in the area, existing zoning, and the style and price range of existing homes. The proposed plan would have a minimum 10 to 15% depreciatory effect on the surrounding homes because of the congestion in the area and the style and placement of the proposed buildings. Development for single-family use would not be an unwarranted risk for the owners because of the demand for homes in this high-class area; whereas, multiple-family development would constitute an economic risk. Metz acknowledged that the property east of Lamon has been rezoned from single-family to multiple-family since some of the homes in the area were built. He gave the multiple-family zoning of the 17 acres west of the subject property very little weight in reaching his conclusions because, in his opinion, that property will never be developed in accordance with that zoning since it is counter to the current trend in developing such properties. In determining that the demand for multiple-family units was low, he considered the occupancy that appeared to exist, the slow sales of condominium units, and conversations with local brokers, builders, and developers.

John Reimer, a consulting engineer for the Village, testified that he was instrumental in designing and supervising the construction of water and sewer lines in the area. The lines which would serve the subject property are along its southern border, but they are not deep enough for the proposed use. There are existing lines east of the property, but they are located in a private easement and are not within the right-of-way for Lamon. There are water and sewer lines within the Lavergne Avenue right-of-way, but the subject property cannot be served by that sewer line because its elevation is too high. The existing system is presently overloaded downstream from the subject property and surcharges during heavy rain, causing an over-

flow of sewage into ditches and basements. Preliminary calculations indicate that the proposed development would generate 820% more sewage than single-family development, which would be detrimental to the entire area. The existing road south of the subject property is on Club grounds, at least five feet west of the dedicated right-of-way for Lavergne. The estimated cost of developing Lavergne is $71,000 to $84,000. The steep grade of the subject property makes it more suitable for single-family development. Reimer admitted that the surcharging problem has existed for three to four years, but the Village has not imposed a moratorium on building permits. It is feasible to change the grade of the subject property, but extensive cutting and filling would be needed and would be more destructive of the trees than single-family development. The Village has a master plan which contains requirements for streets and zoning; it also maintains the street located on Club property adjacent to the Lavergne right-of-way.

Lorraine Alles testified that she lives in a home immediately south of the subject property. She and her husband purchased two lots for $45,000 in 1978 and built their home at a cost of $200,000. Before purchasing, they checked the zoning in the area and were informed that it was zoned for single-family use. Two bedrooms and the family room of her home overlook the subject property. When she inquired about zoning, she learned that the property east of Lamon was zoned for multiple-family use, but did not ascertain the zoning on the north side of the Club.

Edward Cebulski testified that he is a realtor and lives in the area south of the subject property. The demand for single-family homes in the area is fair to good because of the large, wooded lots and the proximity to the Club. There are currently two homes in the area listed for sale with realtors. He was recently involved in a condominium conversion in the area and, during the 12 weeks that he handled the property, no units were sold. There are 10 vacant apartments and four vacant condominiums in the units east of Lamon. He owns a vacant lot in the area south of the subject property and currently has it listed for sale for $35,000.

Joseph DePeulo testified that he lives south of the subject property in a home he built on one of 10 lots he purchased in the area. Before buying, he went to the Village and asked what the zoning was and what the long-range plans were for the area. He was shown a map and was told that the area was zoned for single-family development, and the multiple-family zoning along Lamon was a buffer zone established to provide a transition from the commercial zoning along Cicero Avenue. He has built five homes on his other lots, mostly on

speculation, and has sold each for $65,000 to $110,000 either while under construction or within three to four months after completion. Development for single-family use does not represent an economic risk because of the area, and he currently has a building permit to begin construction of another home. The proposed plan would have a depreciatory effect on his home, which faces the subject property.

Richard Michalek, plaintiff's brother, testified that he lives in a home at 145th and Lamon located on land which was originally part of the subject property. The proposed plan will have a serious depreciatory effect on his property, which was appraised at $115,000 but is currently listed for sale at $89,000. He acknowledged that when he sold his interest in the subject property to plaintiffs, he included a clause in their contract prohibiting the construction of apartments for three years, explaining that he hoped to be able to sell his home and move in the interim. He did not oppose construction of the 12-unit apartment building across Lamon from his home, because the land was already zoned for multiple-family use and such opposition would have been futile.

Wilton Battles, a land planning and zoning consultant, testified for defendants that nine new homes and two new apartment buildings have been constructed in the area near the subject property since 1979, based on a study of building permits issued by the Village. The area around the subject property is predominantly single-family, and he did a land-use survey to determine the character of property immediately adjacent to the subject property. According to his land-use frontage survey, 38.27% of the subject property is adjacent to existing single-family homes, and the rest of the land is vacant; there is no frontage on any land currently developed for multiple-family use. A zoning survey indicates that 75.51% of the subject property's frontage is on land zoned for single-family use, while only 24.41% thereof is contiguous to multiple-family zoning. The trend of development in the area is clearly in the direction of single-family use, based on the new construction in the area. This trend is consistent with the character of the area, which is unique because of the rolling ground, heavy woods, scenic views, and narrow streets. These characteristics, as well as the substantial construction activity, distinguishes the area from other sections of the Village. The apartments east of Lamon constitute a buffer zone that effectively screens the lights and noise from commercial development along Cicero; such buffer zoning has been utilized not only in this area but in other parts of the Village. Approximately one month before plaintiffs' request for rezoning was denied, the owners of the property immediately north of the subject property also re-

quested rezoning from single-family to multiple-family use. The Village did rezone property along Cicero Avenue for commercial use, and other property east of Lamon for multiple-family use; however, the request was denied with regard to property between Lamon and the Club. The subject property is different from the 17 acres of the Club zoned for multiple-family use in that the latter is a larger area with its longest side oriented toward the golf course, there are major clearings on the property, and the zoned area also contains the clubhouse facility and parking lot. Multiple-family zoning on golf course property is a standard concept used by land planners, and its development would not impact on the single-family residential area. The proposed plan of development is not good because there is too much density, it provides insufficient parking, setbacks, buffering and transition, and it has poor access for an intensive development generating a lot of traffic, all of which would have to utilize one 20-foot-wide curved street. The proposed use would have a severe impact on the surrounding area because the apartments face away from the single-family homes, which would overlook parking lots with their inevitable lights and noise. The subject property is suitable for single-family development, and careful planning could maximize the green areas which would be consistent with the character of the area. Such development would generate only a slight increase in traffic, and while 45 trees would have to be cut down, this is less than the 59 trees which would be lost if the property is developed as proposed. The proposed plan is completely out of character with the surrounding area, and because of the higher elevation of homes to the south, it would be impossible to build a berm high enough to screen out the adverse impact. The plan does not allow for dedications of streets which are necessary; if those are included, the buildings on the property will face each other at a distance of only 15 feet. The present zoning is reasonable, and the highest and best use for the subject property is development for single-family use, considering both the economic return to the owner and the impact on the surrounding area. Battles acknowledged that the nine new homes in the area have been built since the apartments were constructed on the east side of Lamon; however, the Village was relying on a buffer-zone concept in allowing construction of those apartments. The Village has an official comprehensive plan adopted pursuant to State planning statutes, but the official map which is a part thereof has not been updated since 1962.

The trial court found that despite the mixture of uses and zoning classifications, the area near the subject property is predominately single-family, and the multiple-family zoning east of Lamon is a prop-

erly created buffer between the commercial uses along Cicero Avenue and the single-family residential area west of Lamon Avenue. Although a 17-acre tract west of the subject property is zoned for multiple-family development, the court found that this area is uniquely suited to such zoning and does not adversely affect the subject property. The trial court acknowledged that the value of the property is diminished to some extent, but found that the hardship to plaintiffs was outweighed by the extent to which present zoning promotes the public health, safety, and welfare. In reaching this determination, the court noted that the expert witnesses differed in their opinions with regard to the weight to be given the adverse impact and the hardship to plaintiffs; it was therefore persuaded that this question was fairly debatable, and the opinions on both sides were reasonable. Under these circumstances, it was compelled to defer to the legislative judgment of the Village on this point. Finally, the trial court found that all experts agreed that the subject property is suitable for single-family residences, and that such development would be consistent with the development of land in the area surrounding the subject property. Based on these findings, the trial court held that plaintiffs had failed to overcome the presumptive validity of the ordinance by clear and convincing evidence and entered judgment for defendants. This appeal followed.

OPINION

■ Plaintiffs first contend that the findings of the trial court are against the manifest weight of the evidence. All parties agree that in determining the validity of a zoning ordinance, the trial court must consider "(1) [t]he existing uses and zoning of nearby property [citations], (2) the extent to which property values are diminished by the particular zoning restrictions [citations], (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public [citations], (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner [citations], (5) the suitability of the subject property for the zoned purposes ***, and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. [Citations.]" (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47, 145 N.E.2d 65, 69.) Plaintiffs further assert that the court should also consider "the care with which the community has undertaken to plan its land use development, and the evidence or lack of evidence of community need for the use proposed" (*Sinclair Pipe Line Co. v. Vil-*

*lage of Richton Park* (1960), 19 Ill. 2d 370, 378, 167 N.E.2d 406, 411), while defendants maintain that plaintiffs must also prove not only that the existing zoning is unreasonable, but that the proposed use is reasonable (*Drogos v. Village of Bensenville* (1981), 100 Ill. App. 3d 48, 53, 426 N.E.2d 1276, 1280). It is plaintiffs' position that when the evidence is considered in the light of all of the above factors, it is clear that the trial court's ruling is against the manifest weight of the evidence.

A rebuttable presumption exists that a zoning ordinance is valid (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65), and the challenging party must establish by clear and convincing evidence that the ordinance, as applied to their property, is arbitrary and unreasonable and bears no substantial relation to the public health, safety, or welfare (*Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 354 N.E.2d 899). Where opinions may differ with regard to the reasonableness of the existing zoning classifications, the legislative judgment becomes conclusive. (*La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 312 N.E.2d 625.) Of course, the mere existence of conflicting opinions on the record does not necessarily mean that the plaintiffs have failed to meet their burden of proof (*Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 324 N.E.2d 406); rather, the court must determine from all the evidence whether the different opinions are reasonable and justifiable (*Aurora National Bank v. City of Aurora* (1976), 41 Ill. App. 3d 239, 353 N.E.2d 61). Any conflicts in testimony are a matter for the trier of fact, and its determination will not be disturbed unless contrary to the manifest weight of the evidence (*Aurora National Bank v. City of Aurora*); that is, unless it appears that the opposite conclusion is clearly evident (*Drogos v. Village of Bensenville* (1981), 100 Ill. App. 3d 48, 426 N.E.2d 1276).

Plaintiffs first argue that the existing uses and zoning of the surrounding property, as well as the current trend in development, support a finding that current zoning is unreasonable, correctly noting that some courts have stated that this factor is of paramount importance. (See, *e.g.*, *Fay v. City of Chicago* (1979), 71 Ill. App. 3d 603, 390 N.E.2d 125.) They rely in particular on the fact that land to the east and west of the subject property is zoned for multiple-family uses, and that two experts testified that the current trend in development has been toward multiple-family use, based on recent rezoning of property east of Lamon and construction of a greater number of multiple-family units than single-family units.

We note, however that other experts testified that over 75% of

the subject property is contiguous to land zoned for single-family use, and that based on recent construction and zoning decisions, the trend of development is toward single-family use. Plaintiffs' argument that the trial court gave undue weight to the survey in question, thereby unduly narrowing its consideration of surrounding uses, has little merit. We believe that the survey was properly persuasive on the issue of what surrounding uses most influenced the character of the subject property. Plaintiffs' experts maintained that the property was most influenced by existing zoning on contiguous parcels to the east and west. The survey in question refuted that testimony, and the trial court apparently found it more persuasive than plaintiffs' unsupported assertions to the contrary. Such questions are uniquely suited to resolution by the trial court, and we will not substitute our judgment thereon.

It is further apparent from the evidence that the trends of development are in accord with current zoning; that is, commercial establishments are developing in the area along Cicero zoned for such use, apartments and condominiums are being constructed in areas zoned therefor, and single-family homes are being built in appropriate areas. The trial court found, and the evidence supports, that the development and uses are in accord with the design of the Village to create a buffer-zone between the commercial area and the residential area. Plaintiffs would have us ignore this obvious pattern and find that the uses are mixed in a haphazard manner, and that because they can count more new multiple-family units than single-family units built in recent times, that the use and trend is "clearly" toward multiple-family. The trial court found otherwise, and its decision is supported by ample evidence, despite plaintiffs' contention that the creation of a buffer zone was not a plan or policy of the Village. The undisputed testimony is to the contrary. The trial court further found that the multiple-family zoning of the 17-acre tract west of plaintiffs' property is reasonable because of the unique character of that parcel of land, and its determination is supported by the testimony of a number of witnesses.

■ With regard to the second factor to be considered, the impact of present zoning on the value of plaintiffs' property, the trial court found that the present zoning diminishes that value, but made no finding on the exact extent thereof. Plaintiffs argue that the testimony of their witness clearly established that the value as zoned was $84,000, while the testimony of the Village's witness that the current value is $200,000 was based on only two comparable sales and is therefore somehow suspect. We do not necessarily agree with plain-

tiffs' assessment of the evidence, since their witness based his estimated value on a comparison of lots not even within the Village, with no explanation of how he found these lots to be comparable, whereas defendants' witness relied on four recent sales within the Village and in the area adjacent to the Club. However, it is not our function to make findings of fact, only to consider those made by the trial court. If plaintiffs wished a ruling thereon, they should have made some objection at trial, or requested a factual determination on that point. Furthermore, the court, after finding that there was some diminution in value, went on to note that this factor is not determinative of the issue. (*American National Bank & Trust Co. v. Village of Oak Lawn* (1979), 81 Ill. App. 3d 952, 401 N.E.2d 963.) Rather, it must be considered in the light of the extent to which the existing zoning promotes the general health, safety and welfare of the public. It is only by comparing these two factors that the trial court can determine whether the relative gain to the public outweighs any hardship imposed on plaintiffs. The trial court found that the experts differed on the question of whether the proposed use would adversely affect surrounding properties, and whether the hardship to plaintiffs was outweighed by the gain in retaining the present zoning. It found these differences of opinion were reasonable, that is, based upon sound factual bases and expertise in the area, and that the issues involved were fairly debatable; it therefore concluded that it was bound to defer to the legislative judgment of the Village on this question.

We have considered the evidence on this point to determine whether the different opinions were reasonable. One witness for plaintiff opined that the proposed plan of development would, by the positioning of the buildings, minimize any adverse impact on adjacent property owners, explaining that the perimeter parking would place sufficient distance between the apartments and homes to the south. He further stated that rezoning would generate additional tax revenues for the Village and schools. A witness for defendants differed with this assessment, testifying that the elevation of the homes to the south prevented effective isolation of that property from the adverse impact of overlooking a parking lot. Furthermore, he testified that the proposed plan places buildings five feet from the lot line of a home located on the corner of 145th and Lamon, and no screening is provided for the land north of the subject property which is zoned for single-family residences and contains an existing home. Experts similarly disagreed on whether the existing street system was adequate for the proposed use, and whether the increased traffic which was bound to develop would have any adverse impact on surrounding

homes. Real estate appraisers differed on the extent to which the proposed development would adversely affect the surrounding land, with one stating that there would be no depreciatory effect not already caused by pre-existing multiple-family development, while the other testified that there would be a minimum 10-15% monetary depreciation in surrounding property values if the proposed plan were adopted. Another witness for plaintiffs agreed that homes in the area would be more marketable if no rezoning were permitted. While their opinions differed, each expert had before it the same evidence, was qualified to render an opinion, and made his determination based on personal experience. We also note that a number of residents testified that, in their opinion, the proposed rezoning would adversely affect their property, while others stated that they purchased their homes in reliance on the existing zoning. Plaintiffs suggest that we ignore this testimony because property owners "ha[ve] no absolute right in the continuation of a zoning classification." (*Thompson v. Cook County Zoning Board of Appeals* (1981), 96 Ill. App. 3d 561, 577, 421 N.E.2d 285, 298.) While it is true that rezoning will not be denied solely because neighboring property owners object, their opinions are not to be ignored, for "[o]ther persons living in the *** district involved have a right to rely upon the precept that the classification will not be changed within the district unless the change is required for the public good." (*Urann v. Village of Hinsdale* (1964), 30 Ill. 2d 170, 176, 195 N.E.2d 643, 647.) Based on the foregoing evidence, as well as other testimony of record, we concur with the trial court's finding that the question whether public gain in retaining existing zoning outweighs the hardship to plaintiffs was, at best, debatable, and the legislative judgment on this point therefore must stand.

With regard to the fifth and sixth factors set forth in *La Salle*, the trial court found, and plaintiffs concede, that the subject property is suitable for single-family development. However, plaintiffs point out that the subject property has been vacant for 30 years and no offers have been received to develop it. They assert that the evidence therefore clearly supports a finding for them on this factor. However, we note that plaintiffs testified that they have made no attempts to sell the property or develop it for single-family use because it has been their goal since inheriting it to develop the property for multiple-family use. As we recently noted:

> "One relying on the length of time the property has remained vacant must establish that the property is unsaleable, vacant or undeveloped because of the zoning classification. Absent such proof, we would have no more reason to hold the vacancy of

the property was occasioned by improper zoning than we would to hold that the vacancy occurred because no attempts were made to use or develop the property, or because other difficulties totally unrelated to zoning had been encountered." *Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 384, 402 N.E.2d 719, 731.

Plaintiffs further maintain that two additional factors must be considered, that is, the comprehensiveness of the Village's plan for the use and development of the land and the need for the proposed use in the area. These factors were not recited in the trial court's order, and apparently no findings were made thereon. We note that plaintiffs did not object to omission of the consideration of these factors, nor did they request findings thereon. Nevertheless, the parties have briefed and argued these points, and we find that neither factor supports plaintiffs' contention that the present zoning is unreasonable. Plaintiffs argue that the lack of a comprehensive plan "weakens" the presumed validity of the zoning ordinance, citing *Forestview Homeowners Association, Inc. v. County of Cook* (1974), 18 Ill. App. 3d 230, 309 N.E.2d 763. They assert that the evidence shows that the Village had no such plan, supporting their argument by quoting the trial court's remark that "[t]he big problem with your community from a zoning standpoint *** is that you don't have a master plan for your village." We have read the above quotation in context, and believe that the court was referring, not to the total lack of a zoning plan, but to the apparent lack of a plan for street development. We further note that this remark occurred during presentation of plaintiffs' case-in-chief, before the Village had any opportunity to place its zoning plans in evidence. Later, uncontroverted testimony established that the Village does, in fact, have a comprehensive plan consisting of an official map, specifications for street construction and paving, zoning ordinances, and subdivision control ordinances. Plaintiffs maintain that, because the official map has not been updated since 1962, we must assume that no comprehensive plan exists. However, there is no testimony that other parts of the plan have not been updated, and plaintiffs cite no authority for the proposition that subsequent changes in zoning must be presumed arbitrary simply because no one thought to recolor the map.

Plaintiffs' contention that the proposed use is needed in the area was subject to conflicting evidence. Their experts asserted that there was a demand for multiple-family units, whereas the market for single-family homes was depressed. They further testified that there were only two vacancies in the immediate area, based on visible evi-

dence of occupancy. This testimony is totally contradicted by witnesses testifying for defendants, who stated that in this particular area there is little need for multiple-family units, there is a demand for single-family homes, and there are 13 vacancies in multiple-family units in the immediate area, again based on personal observation. One expert called by plaintiffs testified that there was a need for both types of housing in the area. On this point, then, the opinions of the experts differ, and we cannot say that the basis for any opinion is unreasonable, since all purported to speak from personal experience, and presented resumes clearly establishing their expertise in their respective areas. Such evidence does not constitute the clear and convincing proof needed to overcome the presumed validity of the zoning ordinance.

Defendants maintain that plaintiffs have also failed to prove that the proposed development of their property constitutes a reasonable use thereof. The trial court did not reach this question, and no findings were made thereon. In the light of our determination that the trial court's findings on the issue of the reasonableness of present zoning is not against the manifest weight of the evidence, we need not reach this issue. Plaintiffs must prove both the unreasonableness of current zoning and, according to some courts, the reasonableness of the proposed use. Since plaintiffs have failed to meet their burden with regard to the first issue, it is immaterial whether they could or did prove the latter.

■■■ Finally, the plaintiffs contend that the trial court erred in admitting evidence of the Village building code, fire code, and subdivision ordinances. They concede that the trial court admitted this evidence only as it related to zoning, and that it struck other testimony on these points as irrelevant to a determination of the reasonableness of existing zoning. They also concede that, because of the trial court's restrictions on the use of this evidence, the error in receiving it, if any (and plaintiffs do not cite a single authority supporting their contention that such evidence is not proper), is rendered harmless by the trial court's limitation on its use and striking of portions thereof. Nevertheless, they ask that we find that admission of this evidence was so fundamental an error that we must disbelieve the trial court's express statements that the evidence in question would be considered only in relation to zoning, and that it did not consider the stricken testimony in reaching its final determination, and grant them a new trial. This argument is frivolous, and made without any citation to relevant authority, in contravention of Supreme Court Rule 341(e)(7) (73 Ill. 2d R. 341(e)(7)). For this reason alone, we would be justified in deeming the

1040

question waived. (See *Williamson v. Opsahl* (1981), 92 Ill. App. 3d 1087, 416 N.E.2d 783.) Furthermore, having read the trial court's findings, both oral and written, we find absolutely no basis for believing that it did not limit its consideration of the evidence as stated, or that its decision was not otherwise based on proper evidence and arrived at in a thoughtful, well-reasoned manner.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

WILSON, P.J., and LORENZ, J., concur.