ARTHUR N. GUNDERSON et al., Plaintiffs-Appellees, v. THE VILLAGE OF HINSDALE, Defendant-Appellant (Cary N. Polikoff et al., Intervening Defendants).

Second District  No. 2—86—0412

Opinion filed May 29, 1987.

Thomas T. Burke, William E. Ryan, and Barry A. Springer, all of Burke & Ryan, of Chicago, for appellant.

Jeffrey A. Kripton, of Chicago, for appellees.

94

JUSTICE NASH delivered the opinion of the court:

Defendant, village of Hinsdale (village), appeals from a judgment of the circuit court which found that the village's zoning ordinance was arbitrary and unreasonable as applied to the real estate owned by plaintiffs, Arthur N. Gunderson and Richard A. Chatfield. The village contends that the judgment of the trial court was contrary to the manifest weight of the evidence. We agree and reverse.

In 1965, plaintiffs purchased 1.08 acres at the southeast corner of Washington Street and Ogden Avenue in Hinsdale for $35,500. At that time, the property was zoned "A" for single-family use and divided into two lots; plaintiffs moved into the residence located on lot 2 of the property and lot 1 remained vacant. In March 1983, plaintiffs listed the property for sale with Stella Glodek, a local broker, for $359,100. In May 1984, Dr. Wafik Hanna entered into a contract with plaintiffs to purchase the property for $342,500, contingent upon its rezoning of the property from single-family residential to a classification which would permit the development of a medical office building.

The subject property has 123 feet of frontage on Washington Street and 257 feet of frontage on Ogden Avenue, which is a four-lane State highway with a 35-mile-per-hour speed limit. A drainage culvert is located at the eastern boundary of the property, and the grade of elevation drops from that point to the western edge of the property. All of the land located north, south, and west of the subject property is zoned and used for single-family residences. Directly east of the subject property is one parcel zoned Buffer-2 for residential or professional office use, which is designed to provide a transition from residential to business uses. That parcel was rezoned from residential to buffer zoning in 1981 to permit the construction of the Neuroscience Center, a 7,000-square-foot medical office building. East of that parcel the land is zoned for C-2 commercial uses. See Appendix A.

On June 4, 1984, plaintiffs filed a petition with the village to rezone their property from "A" single-family residential to Buffer-2, which was approved by the village planning commission, but was subsequently denied by the village board of trustees. Plaintiffs then sought a declaratory judgment in the circuit court that the denial of rezoning by the village was arbitrary and capricious.

At trial, Dr. Hanna testified that his proposed development of the property would be with a two-story 8,000-square-foot building having a residential design and set back 84.5 feet east from Washington Street. A parking lot for 41 vehicles would be located east of the building and Dr. Hanna proposed to place a "green space" restrictive covenant in the title to the property to maintain the existing trees

and foliage on the west portion of the site. He stated that it would be difficult to observe the structure from Washington Street because of the landscape. Dr. Hanna's medical practice would occupy the first floor of the proposed structure, where he would examine 15-18 patients per day, and the second floor of 3,100 square feet would be leased to other physicians. He testified that he had been unable to acquire office space in the village in other locations and that, based upon his experience in the area, there was a market for his medical services.

Plaintiff, Richard Chatfield, testified that he and Arthur Gunderson purchased the property for residential use in 1965. Since that time, the property east of their home had been rezoned for commercial and business uses. He testified that plaintiffs had opposed the rezoning of the adjacent property upon which the Neuroscience Center is located on several occasions from 1972 to 1981. After that property was rezoned in 1981, the value of plaintiffs' property was reduced and they agreed to sell it to Dr. Hanna. He stated that Ogden Avenue has changed from a quiet residential street to a major highway since 1965 and that plaintiff's property was unusual because it faced the street, was closer to it and was not screened from traffic by tall fences. He testified that the village has never had a long-range plan for Ogden Avenue or a logical zoning plan for separating residential and commercial properties. Chatfield believed that the logical cutoff point for zoning purposes was Washington Street.

Plaintiff, Arthur Gunderson, testified that all of the commercial property along Ogden Avenue in Hinsdale had been zoned for residential use in 1965 and that all current residential property on the street utilized screening and buffering devices such as landscaping, berms and stockade fences. He stated that the noise, lights and fumes from the intense traffic are serious impediments to development of residential property along Ogden Avenue and that plaintiffs did not make any attempt to market, advertise, sell, develop, or rezone their property until 1983.

Stanley Glodek, the architect of the proposed medical facility and husband of plaintiffs' real estate broker, testified that the proposed building would be set back from Washington Street to preserve the natural growth in that area and screen the building from the adjacent residential properties. Glodek testified that 15% of the property would be maintained as greenery, that the parking area was more than sufficient for the needs of the medical facility and that the building design met the village's requirements for buffer-zone property. The building design and materials would be residential and the use of

the property would not create any significant noise or fumes. He noted that the Neuroscience Center did not reflect a residential style but had been approved by the village in 1981.

Wilton Battles, a city planning and zoning consultant with 18 years' experience, testified that the subject property was unusual because of the 16-foot drop in height from the east corner of the lot to its opposite end, the dense foliage, the configuration of the property and its extensive frontage along Ogden Avenue. He stated that the Neuroscience Center had a detrimental impact on the value of the subject property because it was elevated above the property and was not screened by vegetation and that the small drainage ditch which existed between the properties did not constitute a major physical feature or barrier. He testified that a village ordinance indicated that an appropriate line of zoning demarcation should be a street or alley and that the proper boundary in the present case was Washington Street. Battles also noted that only plaintiffs' property and one other home face Ogden Avenue and that the property immediately north of the subject property had a severe slope and a ravine drainage area which made it unsuitable for residential or commercial purposes.

Battles further testified that the village had systematically zoned buffer areas 5 to 10 feet away from residential properties and that Dr. Hanna's proposed facility was set back 15 feet from the south property line. He stated that the village's use of B-2 districts indicated an intent on the part of the village that residential and professional office uses could coexist in the same vicinity. Battles also stated that the clear trend of development in the area was for office use and that several office buildings had recently been developed along Ogden Avenue, including a savings and loan association, an office development, a specialty retail facility, the Humana MedFirst Medical Center and the Neuroscience Center. Battles stated that the highest and best use of the property would be the proposed medical facility, which he defined as the use which would return the greatest economic value to the landowner and still be compatible with applicable zoning classifications. He stated that the village's comprehensive plan would not prohibit development of the property as a B-2 area and the office building would not have an adverse impact on the surrounding properties.

Battles also testified that an alternative proposal by the village that the subject property could be subdivided into single-family lots was impractical. A structure built on lot 1 of the property would have to be situated over a drainage ditch area to the south of the property and necessitate removal of the oak trees under existing village requirements. He stated that the subdivision would affect the quality of

the neighborhood more than the medical office facility because it would require destruction of the natural landscaping. He also noted that, under current village restrictions, the property could not be restructured into three single-family lots to permit access from Washington Street and traffic noise could not be screened out by the use of tall fences. Moreover, the Neuroscience Center would adversely affect the marketability of the farthest east lot.

On cross-examination, Battles testified that all of the property on Ogden Avenue west of Washington Street is zoned for single-family use. He stated that there is no left-turn sign for westbound traffic from Washington Street onto Ogden Avenue, that it takes six seconds to make a proper left turn, and that there would be adequate time to make a left turn out of the proposed medical facility. He also stated that it is not necessarily true that residential property will be less marketable if it abuts commercial property. Battles agreed that he had not done any work in Hinsdale in the last five years, had never worked on any single-family development in Hinsdale and had never participated in the drafting of comprehensive plans in Du Page County.

Joseph Zgonina, a professional engineer specializing in traffic engineering, testified that Ogden Avenue experiences 33,000 to 35,000 cars per day and vehicles on that street travel in groups which create significant gaps in the traffic stream and allow vehicles to safely enter onto and exit off the highway. He noted that vehicles entering, parking and exiting from the Neuroscience Center did not experience any difficulty and testified that the proposed medical building would not cause any traffic problems. On cross-examination, Zgonina testified that the proposed use would generate 100 additional vehicular movements in and out of the subject property during the afternoon peak hour and 600 vehicular movements every weekday. He also stated that he did not know how many traffic accidents had occurred at or near the intersection of the subject property.

Charles Benson, a real estate appraiser, testified that the general zoning in the subject area was business and commercial to the east and residential to the south, west, and north. He stated that the current fair market value of the property as presently zoned is $140,000 and its value under the proposed use would be $325,000. Benson testified that the highest and best use of the property would be for a commercial or B-2 use and that would not adversely affect the surrounding properties because of the terrain, foliage on its western edge, and the trend of development toward commercial use in the area. He noted, however, that a cul-de-sac development with three single-family

lots would not be the highest and best use because the Neuroscience Center would adversely affect use of the adjacent property for residential use and the lots would front on both the proposed cul-de-sac road and Ogden Avenue or Washington Street. On cross-examination, Benson testified that plaintiffs' proposed use would not adversely affect the Washington Street residential properties because the view would be screened and the proposed use is attractive in design. He also noted that the residential market for property in Hinsdale is excellent because few vacant lots are available for residential development.

The village's first witness was Thomas Collins, a real estate broker and consultant who testified that the highest and best use of the subject property was for single-family development which would require a subdivision of the two existing lots into two or three lots with access onto Washington Street. He defined the highest and best use as that which would return the greatest amount of money but would not damage the surrounding property. He stated that the residential subdivision would be worth $215,000, would comply with all village ordinances and that housing in the village was in great demand. It was Collins' opinion that the fair market value of plaintiffs' property in December 1984 was $210,000 and the property would have a value of $350,000 if zoned for Dr. Hanna's proposed medical facility. However, the facility would cause a total devaluation of 10% to 15%, or $96,000, to the value of the four homes closest to the facility because it would change the character of the neighborhood and the views from the homes, introduce a commercial use into an exclusively residential neighborhood, increase the likelihood of further commercial intrusions in the area, and result in less demand for the homes. He stated that no other office building in Hinsdale on Ogden Avenue was as close to a single-family home as the proposed medical building. He concluded that plaintiffs would not suffer hardship and that the village would significantly benefit by maintaining the residential character of the neighborhood.

On cross-examination, Collins agreed that the proposed medical center would benefit the community and that, under his definition of highest and best use, every office property depreciates adjoining residential property; he agreed that the Neuroscience Center had depreciated plaintiffs' residential property value. Collins testified that access onto Ogden Avenue from the proposed subdivision would be undesirable and then stated that village ordinances would not permit a subdivision plan that required a public street to access onto Washington Street.

Rolf Campbell, a professional land planner, testified that the village had recently retained him to provide a second update to Hinsdale's 1967 comprehensive plan. He stated that the village ordinances do not indicate a preference to use streets as boundaries between residential and buffer areas and such boundaries should be located at rear or side yards where possible to provide proper screening for the transition. Streets or roads are not ideal boundaries because similar uses should be placed along a street so that traffic on that street services the same uses. He testified that the current boundary between the Neuroscience Center and plaintiffs' property is a proper one because it maintains the 300-foot depth of all single-family lots east of Washington Street, it is situated on a culvert and change in grade which form a natural topographical boundary, and it is the logical boundary for residential development with access onto Washington Street. He stated that the highest and best use of the subject property was as a single-family development with access onto Washington Street and that he had prepared the subdivision plan for the alternate development. He testified that four other locations in Hinsdale have private easements as the only means of ingress and egress onto public streets and that he was told by the village building commissioner that the plan complied with the village ordinances. Campbell noted that the Neuroscience Center was an appropriate area for B-2 zoning because its only form of ingress and egress was onto Ogden Avenue, while the subject property has two possible means of entry and exit.

Campbell also testified that all property west of Washington Street on Ogden Avenue is zoned for residential use and that almost 20 new homes have been constructed in the last 10 years with side or rear yards on Ogden Avenue. He stated that there is a large demand for single-family residential developments in Hinsdale. Campbell concluded that Dr. Hanna's proposed facility was inappropriate because it would introduce commercial property onto Washington Street for the first time, would permit an office building on Ogden Avenue to be situated 30 feet from an existing single-family residence for the first time, and the green space proposal was insufficient to protect the adjacent residential uses. On cross-examination, Campbell agreed that Dr. Hanna's proposed medical building is aesthetically attractive, but stated that it would not be compatible with single-family residences because of its size. He also noted that, although there was a community need for medical office use, numerous office buildings were under construction or vacant in Hinsdale.

Gerald Lindgren, a traffic engineer, testified that he reviewed 67 traffic accident reports in the area and completed a gap study to de-

termine the amount of time required for a car exiting the proposed facility to make a turning movement. He concluded that the proposed use would create a hazardous situation that would cause traffic accidents and stated that a separate left-turn lane from Ogden Avenue would have to be installed to make the proposed use safe. On cross-examination, he testified that only four accidents had occurred in the Ogden Avenue/Washington Street area from January 1982 through August 1985.

Fred Tadrowski, an appraiser, testified that the highest and best use of the property was for single-family development under the subdivision plan and that the value of the property under the plan was $180,000. He stated that Hinsdale was one of the finest residential communities in Du Page County and there was a high demand for single-family homes. Tadrowski examined the four closest homes to the property and concluded that the proposed medical facility would cause the value of the homes to depreciate 10% to 15%, or $100,000, because it would change the character of the area, destroy the views from the homes, introduce a commercial use into the neighborhood and reduce the demand for the homes. He stated that the proper boundary between buffer and residential zoning in the area was on the eastern border of the property because of the natural culvert, the depth of single-family lots south of the property and the fact that the subject property has access to a street other than Ogden Avenue. He testified that there was no community need for the medical building because five office buildings with 200,000 square feet of unrented space were currently under construction and 15% to 20% of office space in Hinsdale was currently vacant.

The village also called four neighboring homeowners as witnesses. The homeowners stated that they had relied on the existing residential zoning of the surrounding properties in purchasing their homes and that they believed the proposed medical facility would devalue their homes by 10% to 25% because it would change the exclusive residential character of the area. The homeowners estimated the current value of their homes at prices ranging from $142,000 to $280,000.

On rebuttal, Stella Glodek testified that she was the real estate broker involved in the transaction between plaintiffs and Dr. Hanna and stated that the highest and best use of the property was the proposed medical facility. She stated that the fair market value of the subject property was $115,000 to $125,000 and that the medical facility would not depreciate the value of the surrounding properties because it would be built on a lower elevation. She stated that Washington Street should be the boundary for zoning because plaintiffs'

property is the only parcel on the block facing Ogden Avenue that is not zoned for office or commercial use. On cross-examination, she testified that she sold the property for the Neuroscience Center and that the center reduced the value of plaintiffs' property because it is on a higher elevation.

Defendant's exhibit No. 7, which was an ordinance and stipulation by the village that it would take whatever action was necessary to approve a resubdivision of the subject property for residential use, was admitted into evidence but the court refused to admit a copy of the subdivision plan prepared by Rolf Campbell into evidence. The court found that the means of access within the plan was a street within the meaning of the village zoning ordinances and that it did not meet the village's requirements for the width of streets. At the close of testimony, the trial court conducted an on-site inspection of the subject property and neighborhood.

The trial court found that the village's application of the residential zoning classification to plaintiffs' property was arbitrary and unreasonable and enjoined the village from enforcing it against the property. The court further found that plaintiffs were to be permitted to improve the property consistent with the proposed medical facility. This appeal followed.

The village contends that the trial court erred in ruling that plaintiffs had established that the ordinance was arbitrary and unreasonable as applied to plaintiffs' property.

A zoning ordinance is presumed valid and the party attacking the ordinance bears the burden of proving its invalidity. (*Van Duyne v. City of Crest Hill* (1985), 136 Ill. App. 3d 920, 923, 483 N.E.2d 1307; *Kleidon v. City of Hickory Hills* (1983), 120 Ill. App. 3d 1043, 1053, 458 N.E.2d 931, *appeal denied* (1984), 101 Ill. 2d 546.) A party challenging a zoning ordinance must establish by clear and convincing evidence that it is arbitrary and unreasonable as applied to his property and without substantial relation to the public health, safety, or welfare (*Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 310, 469 N.E.2d 183; *City National Bank v. County of Kendall* (1986), 140 Ill. App. 3d 933, 934, 489 N.E.2d 486), and, further, that the proposed use of the property is reasonable (*Oak Lawn Trust & Savings Bank v. City of Palos Heights* (1983), 115 Ill. App. 3d 887, 891, 450 N.E.2d 788, *appeal denied* (1983), 96 Ill. 2d 540). Where there are conflicting opinions, the trial court must determine from all the evidence whether the different opinions are reasonable and justifiable. (*Michalek v. Village of Midlothian* (1983), 116 Ill. App. 3d 1021, 1034, 452 N.E.2d 655; *Aurora National Bank v. City of Au-*

*rora* (1976), 41 Ill. App. 3d 239, 244, 353 N.E.2d 61.) On review, the judgment of the trial court is entitled to great weight and should not be reversed unless it is against the manifest weight of the evidence. *Rosehill Cemetery Co. v. City of Chicago* (1983), 114 Ill. App. 3d 277, 283, 448 N.E.2d 930; *Thompson v. Cook County Zoning Board of Appeals* (1981), 96 Ill. App. 3d 561, 576, 421 N.E.2d 285, *appeal denied* (1981), 85 Ill. 2d 576.

■ Initially, we must consider whether the trial court erred in finding that a subdivision plan proposed by the village as an alternative use of the subject property was contrary to the village ordinances and excluding it from evidence. It has been held that a proposed subdivision plan, if reasonable, may be a factor in determining the central question of whether or not a plaintiff's proposed use is the best possible use of a tract of land. *American National Bank & Trust Co. v. City of Chicago* (1964), 30 Ill. 2d 251, 254-55, 195 N.E.2d 627; *Pillman v. Village of Northbrook* (1978), 65 Ill. App. 3d 40, 44, 382 N.E.2d 399.

Here, the court refused to allow the village's subdivision plan into evidence because the easement which provided access onto Washington Street was only 20 feet wide and section 11−1−12A of the village's subdivision regulations required that local streets be at least 66 feet wide. However, private streets and easements are specifically authorized in the village regulations (Subdivision Regulations, section 11−1−7G) and Rolf Campbell testified that four other locations in Hinsdale utilize similar easements as the sole means of access to private residences. We consider that section 11−1−12A of the village ordinances refers only to public streets and does not mandate a minimum width for private rights-of-way. We note that the village agreed that it would take whatever action was necessary to resubdivide the subject property into three single-family lots with access onto Washington Street and conclude that the subdivision plan may be considered in determining whether the plaintiffs overcame the presumptive validity of the ordinance.

■ In *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47, 145 N.E.2d 65, our supreme court set forth six factors to be considered in this determination. A court must consider (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the zoning restrictions, (3) the extent to which destruction of the plaintiff's property value promotes the health, safety, morals, or general welfare of the public; (4) the relative gain to the public as compared to the hardship to the property owner; (5) the suitability of the subject property for the zoned pur-

poses; and (6) the length of time the property has been vacant as zoned, considered in the context of the development in the vicinity of the subject property. (See also *City National Bank v. County of Kendall* (1986), 140 Ill. App. 3d 933, 934, 489 N.E.2d 486; *Michalek v. Village of Midlothian* (1983), 116 Ill. App. 3d 1021, 1033, 452 N.E.2d 655.) The supreme court in *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 378, 167 N.E.2d 406, added two more factors to be considered—community need for the proposed use and the care with which the community had undertaken to plan its land use development. (See also *Drogos v. Village of Bensenville* (1981), 100 Ill. App. 3d 48, 54, 426 N.E.2d 1276, *appeal denied* (1981), 88 Ill. 2d 550; *DeMarie v. City of Lake Forest* (1981), 93 Ill. App. 3d 357, 361, 417 N.E.2d 641, *appeal denied* (1981), 85 Ill. 2d 564.) Aesthetic factors may also be a consideration in the decision. *Grobman v. City of Des Plaines* (1975), 59 Ill. 2d 588, 595, 322 N.E.2d 443; *La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 432, 312 N.E.2d 625.

It has been said that the first factor, the existing uses and zoning of the surrounding property, is of paramount importance. (*Michalek v. Village of Midlothian* (1983), 116 Ill. App. 3d 1021, 1034, 452 N.E.2d 655; *Fay v. City of Chicago* (1979), 71 Ill. App. 3d 603, 608, 390 N.E.2d 125.) The evidence is that all of the property to the north, south, and west of plaintiffs' tract is zoned for single-family use and has residences situated upon them with values in excess of $100,000. To the east of the subject property is the Neuroscience Center, which was rezoned as a buffer zone in 1981, has no access other than to Ogden Avenue and is the westernmost nonresidential property on Ogden Avenue in Hinsdale. At present, the subject property is the only residential property on the Ogden Avenue block, and the only current means of ingress and egress is on Ogden Avenue.

As to the second factor, the property was purchased in 1965 for $35,500, and Charles Benson testified that it had a current fair market value of $140,000 and would be worth $325,000 under the proposed use. However, Thomas Collins testified that the fair market value of the property would be $215,000 under the current zoning if the village's subdivision plan was implemented. Both Collins and Wilton Battles stated that, in any event, the Neuroscience Center diminished the value of plaintiffs' property and would diminish the value of any home on the property. Fred Tadrowski testified that the value of the property under the subdivision plan was $180,000.

The trial court concluded that the present value of the property was $140,000, but its finding was based on an erroneous determina-

tion that the village's subdivision plan violated the village ordinance as to the width of streets. We conclude that the value of the property, if it remained zoned residential, would be between $180,000 and $215,000. Both parties acknowledge that it would have a higher value if it was zoned for buffer or commercial use, but that factor is not determinative. See *Jackson v. County of Du Page* (1973), 10 Ill. App. 3d 497, 500, 294 N.E.2d 773; *Kellett v. County of Du Page* (1967), 89 Ill. App. 2d 437, 444, 231 N.E.2d 706.

■ With regard to the third factor, the extent to which the destruction of plaintiffs' property value promotes the public welfare, it is clear that the residential zoning of the property would protect the value of the surrounding single-family homes from a devaluation of 10% to 25% and prevent the intrusion of a commercial element into the Washington Street neighborhood. Both Collins and Tadrowski stated that the proposed use would reduce demand for property in the area and were supported by testimony of four neighborhood homeowners who stated they relied on the residential zoning in purchasing their properties. Property owners who purchased their property in reliance upon the zoning restrictions are entitled to rely upon the precept that the classification will not be changed unless the change is required for the public good, and this consideration is one of crucial importance. (*Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 382, 402 N.E.2d 719, *appeal denied* (1980), 81 Ill. 2d 588; *Ward v. County of Cook* (1979), 68 Ill. App. 3d 563, 573, 386 N.E.2d 309.) Although Benson testified that the proposed use would not adversely affect the Washington Street properties because the view would be screened and the proposed use was attractive, it seems quite apparent that property values will diminish when a nonresidential use is introduced into a residential neighborhood.

These considerations are also relevant to the fourth factor, the relative gain to the public as opposed to the hardship imposed upon the individual property owner. In addition, we note that the continued zoning of plaintiffs' property for residential use would halt further commercial expansion and establish a definite boundary between residential and buffer zones. Rolf Campbell testified that such boundaries should be located at rear or side yards to provide proper screening for the transition and noted that the change in grade and the existing culvert on the eastern edge of plaintiffs' property form a natural topographical boundary. Both parties agree that the proposed use would not increase the amount of noise or pollution in the area but would increase the amount of traffic.

As to the fifth and sixth factors, the village's subdivision plan in-

dicates that the subject property is suitable for single-family development and there was testimony at trial that there is a high demand for single-family residences in Hinsdale. Also, plaintiffs conceded that they had made no attempt to develop lot 1 or market the property for residential use since purchasing the property in 1965 and had listed the property in 1983 at a price which was appropriate only for buffer zone or commercial use.

The final three factors to be considered are the community need for the proposed use, the extent to which the community had planned its land use development and the aesthetics of the proposed facility. There was conflicting testimony as to the community need for the medical building. Dr. Hanna stated that he had been unable to acquire suitable office space in Hinsdale and that there was a market for his type of medical service. Rolf Campbell and Fred Tadrowski testified, however, that there was no community need for the medical building because there were numerous office buildings under construction or vacant in Hinsdale. The only evidence of the village's planning for land use development was that no property west of the Neuroscience Center has been zoned for nonresidential use on Ogden Avenue and we do not consider that this was sufficient to show that the village had established a long-range zoning plan. Finally, it is unquestioned that the proposed medical facility is designed to be both attractive and of a residential nature and that the green space proposal for the western portion of the property would provide some degree of screening of the building from Washington Street.

■ Considering all the relevant factors, we conclude that plaintiffs have failed to overcome the presumptive validity of the zoning ordinance as applied to their property. Although the proposed use would substantially increase the value of plaintiffs' property, it would diminish the value of the neighboring homes and, more importantly, extend the boundary between commercial and residential uses and introduce a nonresidential element into the neighborhood; that could set a precedent for more serious commercial intrusions in the future. We agree with the village witnesses who testified that the subdivision proposal submitted by the village is a more viable use of the property because it simultaneously increases the value of plaintiffs' property under the present zoning restriction while retaining the existing boundary between the conflicting uses. Also, the weight of the evidence is that there was not a strong community need for the proposed medical facility. While it is true that the evidence does not show a long-range zoning plan by Hinsdale and that the design of the facility and the green space proposal would serve to maintain the residen-

tial character of the property to some extent, those considerations are not alone sufficient to establish by clear and convincing evidence that the village's application of its ordinance to the subject property was arbitrary and unreasonable. As the trial court's judgment was against the manifest weight of the evidence, it must be reversed.

Reversed.

DUNN and INGLIS, JJ., concur.