ST. LUCAS ASSOCIATION, Plaintiff-Appellee and Cross-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellant and Cross-Appellee.

First District (1st Division)   No. 1—89—2710

Opinion filed April 8, 1991.

818

Kelly R. Welsh, Corporation Counsel, of Chicago (Ruth M. Moscovitch and Jean Dobrer, Assistant Corporation Counsel, of counsel), for appellant.

Rudnick & Wolfe, of Chicago (Thomas F. Geselbracht and Philip L. Goldberg, of counsel), for appellee.

Mayer, Brown & Platt, of Chicago (Herbert L. Zarov, Daniel J. Delaney, and Anne K. Lewis, of counsel), for amicus curiae North River Commission.

JUSTICE BUCKLEY delivered the opinion of the court:

The City of Chicago (the City) appeals from an opinion and order of the circuit court of Cook County which declared unconstitutional its zoning ordinance as applied to a tract of land (the property) owned by plaintiff St. Lucas Association (the Association).[1] The Association

---

[1]The North River Commission has filed an amicus curiae brief in support of the City. The Commission is an Illinois not-for-profit corporation which acts as an umbrella organization for various community groups in the area encompassing the property.

cross-appeals, contending that the circuit court erred in denying its claim for "just compensation" based upon a loss of use and temporary taking of the property. For the reasons that follow, we affirm.

The property is a 7.4-acre, rectangular plot of land at the northwest corner of Foster and Pulaski Avenues in the City of Chicago and represents the southeastern corner of the St. Lucas Cemetery. The property is largely vacant, unconsecrated, and has never been used for interment. The north branch of the Chicago River, which traverses the area in a northwest-southeast manner, grazes the southwestern corner of the property.

The arterial streets that traverse the area are as follows. One-half mile to the north of Pulaski Avenue is Bryn Mawr Avenue; one mile north is Peterson Avenue. To the south, one-half and one mile, respectively, are Lawrence and Montrose Avenues. One mile to the west of Pulaski Avenue is Cicero Avenue; one-half mile to the east is St. Louis Avenue.

Other than a C2-2 (general commercial district) zoning classification assigned to a small service station at the southeast corner of Foster and Pulaski Avenues, the lands most near the subject property are zoned as single-family residence districts (R1 or R2). None of these lands, however, are used for single-family housing: the closest single-family residences are located about one-quarter mile west of the property on the south side of Foster Avenue.

To the immediate north and northwest of the property lies St. Lucas Cemetery. Montrose Cemetery lies farther north and adjoins St. Lucas Cemetery's northern border and has Bryn Mawr Avenue as its northern border. To the east and northeast of the property, across Pulaski Avenue and bounded by St. Louis Avenue to the east, lies Bohemian National Cemetery and Northeastern Illinois University. To the south of the property across Foster Avenue lies Gompers Park. To the immediate west of the property, between Foster Avenue and the river, lies the remainder of Gompers Park.

The commercial and business zoning and uses near the property are centered south of the property at the intersection of Lawrence and Pulaski Avenues. This intersection hosts one of the principal business districts that services the residences located in the area. Moving north from this intersection along Pulaski Avenue, commercial uses are interspersed with single-family, multifamily, and institutional uses. At Gompers Park, commercial uses stop altogether, save for the small service station located on the corner. Along Foster Avenue, the nearest commercial zoning is at least one-half mile away to the east; the

remainder of Foster Avenue is largely zoned R2 and is used for single-family residences.

The Association is an Illinois not-for-profit corporation which founded the St. Lucas Cemetery 85 years ago. In 1919, the Association purchased a one-acre tract of land located within the present boundaries of the property and fronting on Pulaski Avenue. This one-acre purchase merely filled out the Association's existing land holdings. Earlier, in the early 1900's, the Association had purchased the bulk of the lands that comprise the property, the adjacent St. Lucas Cemetery, and Gompers Park. At that time, Foster Avenue did not continue west of Pulaski Avenue. The lands that comprise Gompers Park were later donated to the Chicago Park District.

In 1923, when the City enacted its first zoning ordinance, the property and adjoining cemetery lands were given an R2 classification. This zoning permits single-family residences on lots not less than 5,000 square feet as well as other uses including, among others, cemeteries, churches, parks, and schools. The property has always retained its R2 classification.

In 1985, the Association entered into an agreement to sell the property for $1,375,000 to a development group contingent upon the property's rezoning from its current R2 classification to a B5-2 classification (general service district). This classification would permit the development group's proposed development plan (the plan), which proposes a 65,000-square-foot grocery store, attendant retail stores, parking, and other shopping amenities.

On May 10, 1986, the Association submitted to the City an application for a zoning change and approval of the plan. After public hearings before the Chicago plan commission and the committee on zoning of the Chicago city council, the committee on zoning recommended rejection of the application. On June 8, 1988, the Chicago city council deferred to the committee on zoning's recommendation, effectively denying the Association's application. This suit followed.

In its suit, the Association sought: (1) a declaratory judgment that the City's zoning ordinance is unreasonable and void as applied to the property and that the Association's plan is reasonable; (2) an injunction barring enforcement of the ordinance against the property and requiring the City to issue the building permits and zoning certifications needed to proceed with the plan; and (3) "just compensation" pursuant to the Illinois Constitution (Ill. Const. 1970, art. I, §15) for the Association's complete loss of "all economically viable uses" of the property during the period between the City's denial of the Asso-

ciation's application and the circuit court's grant of declaratory and injunctive relief.

On September 25, 1989, the circuit court entered a final judgment order which granted the Association's requests for declaratory and injunctive relief, but denied its request for just compensation on the ground that the City's actions did not deny all economically viable uses of the property.

■ The first issue we address is whether the circuit court correctly found that the City's ordinance was unconstitutional as applied to the property. In Illinois, it is well established that a municipality may adopt and amend zoning ordinances as an exercise of the police power in order to promote and protect the public health, safety, morals, comfort and general welfare of the people. (See, *e.g., Jeisy v. City of Taylorville* (1980), 81 Ill. App. 3d 442, 448, 401 N.E.2d 627, 632.) These zoning ordinances carry a presumption of validity, and a person who challenges this presumption has the burden of establishing by clear and convincing evidence that, with respect to his property, the ordinance is arbitrary, capricious and unreasonable and bears no substantial relation to the public health, safety or general welfare. (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46, 145 N.E.2d 65, 69; *Michalek v. Village of Midlothian* (1983), 116 Ill. App. 3d 1021, 1034, 452 N.E.2d 655, 663; *Jeisy*, 81 Ill. App. 3d at 449, 401 N.E.2d at 632.) A zoning ordinance may be valid generally yet be invalid as applied to a particular parcel of property and a particular set of facts. (*Jeisy*, 81 Ill. App. 3d at 448, 401 N.E.2d at 632.) Each case is determined according to its own facts and particular circumstances.

■ In *La Salle National Bank* (12 Ill. 2d at 46-47, 145 N.E.2d at 69), the Illinois Supreme Court set forth the factors a court is to consider in determining the validity of a zoning ordinance: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which the destruction of property values promotes the health, safety, morals or general welfare of the public; (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purposes; and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property.

Additional factors a court may consider are the community need for the proposed use and the care with which the community has undertaken to plan its land use development. *Sinclair Pipe Line Co. v.*

*Village of Richton Park* (1960), 19 Ill. 2d 370, 378, 167 N.E.2d 406, 411.

On appeal, the City's basic contention is that the Association failed to overcome the presumption of validity that attaches to all municipal zoning ordinances. The City contends that, at best, the Association raised only a debatable issue as to the validity of the ordinance and, therefore, the courts are required to defer to the zoning classification the City has assigned to the property. (See *La Salle National Bank & Trust Co. v. County of Cook* (1981), 94 Ill. App. 3d 341, 351, 418 N.E.2d 932, 938.) The Association responds that the circuit court's findings of fact as to each *La Salle* factor are not contrary to the manifest weight of the evidence and that, collectively, the evidence it produced satisfied its burden under *La Salle*. The analysis set forth below considers each of these factors separately in light of the evidence submitted by the parties.

■ The first factor we consider is whether the property "is zoned in conformity with surrounding existing uses and whether those uses are uniform and established." (*LaGrange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 309, 388 N.E.2d 388, 391.) Although no *La Salle* factor is controlling (*La Salle National Bank*, 12 Ill. 2d at 46, 145 N.E.2d at 69), courts recognize this *La Salle* factor as being "[o]f paramount importance." *LaGrange State Bank*, 75 Ill. 2d at 309, 388 N.E.2d at 391.

In addressing this factor, the circuit court concluded that the existing uses and zoning of the nearby property were predominantly "nonresidential" in character and that the main north-south arterial road, Pulaski Avenue, was of a predominantly commercial character. The court noted that the property was surrounded by a complex of cemeteries, a service station, and a park across Foster Avenue. It further noted that the Association's proposed development plan harmonized with "the existing commercial character of the neighborhood" and that no adverse impact on any residential development could reasonably be expected because any such development is "hundreds of feet" from the property.

As to this factor, the parties dispute the character of the lands that surround the property. The City claims that the character of the area surrounding the property is residential because, as shown by the zoning map of the area, the lands around the property are primarily zoned R2 and are being used in conformity with that zoning. The Association, however, notes that the City's assessment of the area is flawed because the character of the area cannot be gleaned from merely looking at a zoning map. Rather, the Association's characteri-

zation of the area emphasizes that nonresidential *uses* surround the property and that these uses are not reflected on the face of a zoning map.

The evidence reflects that the property is located within a well-developed, mature area of the City of Chicago which is undergoing selective redevelopment. To the south of Foster Avenue, the zoning and uses are predominantly residential. These areas represent long-established, single-family and multifamily residential districts. The exception to these residential uses occurs along Pulaski and Lawrence Avenues, which are predominantly zoned for commercial and business uses.

To the north of Foster Avenue, cemetery lands dominate, with the St. Lucas, Montrose, and Bohemian Cemeteries occupying all the lands surrounding the property. Other uses located north of Foster Avenue are Northeastern Illinois University and the former Tuberculosis Sanitarium, with the latter occupying the entire northeastern quadrant formed by Bryn Mawr and Pulaski Avenues. The testimony reflects that in a land planning sense, these uses are classified as institutional uses. When the City enacted its first zoning ordinance in 1923, institutional uses were given an R2 classification. The exact reason for this classification is not apparent from the record, but does explain how the property and the cemetery lands surrounding it, although not used residentially, received their R2 residential zoning classification.

As to this factor, we believe that the circuit court correctly found that the zoning and uses surrounding the property are nonresidential. We find the distinction between a land use and the zoning classification assigned to that use critical in this case. If one merely looks at a zoning map, the City is correct in its contention that the property is surrounded by R2 zoning and by uses that conform to that zoning classification. We believe, however, that this analysis ignores the non-residential character of the property generated by the institutional and high-use arterial streets that surround it. In our opinion, it stretches reality to characterize a tract of property as residential where, as here, the nearest residences are located a considerable distance away. Accordingly, allowing the plan to proceed will not result in an unwarranted intrusion of a commercial facility into a residential district as the City contends. In summary, as to this *La Salle* factor, we believe that the circuit court's conclusion that the surrounding zoning and uses are nonresidential is not against the manifest weight of the evidence.

The second *La Salle* factor is the extent to which property values are diminished by the particular zoning restrictions. As to this factor, the circuit court concluded that "a substantial decrease in value (millions of dollars) has been shown." The City contends that the circuit court's conclusion overlooks the evidence it presented which showed that the property has substantial value as zoned.

■ Initially, we note that this factor requires a court to consider the difference between the value of the property as presently zoned and the value it would have if zoned to allow the proposed use. (See *Oak Park Trust & Savings Bank v. Village of Palos Park* (1982), 106 Ill. App. 3d 394, 402-03, 435 N.E.2d 1265, 1272.) Proof of a very large difference in value is insufficient by itself to overcome the presumption of validity of a zoning ordinance. *Du Page Trust Co. v. County of Du Page* (1975), 31 Ill. App. 3d 993, 999-1000, 335 N.E.2d 61, 66.

■ The Association's evidence demonstrates that the property is worth significantly more if developed commercially than if developed in accordance with its R2 classification. William McCann, the Association's expert appraiser, testified that the value of the property as zoned was $800,000. This figure was based on his estimate that the property's size limited to 40 the number of single-family lots that could be placed there and that profit considerations limited the price a developer would pay to $20,000 per raw lot. Allen Kracower, the Association's expert land planner, agreed that the property could generate only 40 single-family lots.

McCann and Kracower also testified that the property could be worthless if an "ambiguous" provision within the City's zoning ordinance required a 300-foot "buffer" between any residential development and a cemetery. This provision, which was read into the record, provided: "Cemeteries, including crematories and mausoleums in conjunction therewith, if not located within 300 feet of any other property and residence district." McCann stated that if this provision were read to require a 300-foot buffer between residences on the property and adjacent cemetery lands, the property would be worthless because only a 30-foot by 230-foot strip of land would remain for residential development. On cross-examination, both McCann and Kracower admitted that under one reading of the provision, the buffer would only be required where residences are located near crematories and mausoleums, not merely cemetery lands. In this regard, they acknowledged photographs of residential developments where cemetery headstones were located in close proximity to residences. As to this

point, we also note that the aerial photograph of the area reveals headstones located within 300 feet of single-family residences.

Richard Roddewig, an expert appraiser, testified for the City regarding the value of the land as zoned. He testified that 60 single-family residences could be placed on the property. This estimate was predicated on Roddewig's review of an exhibit depicting a development plan prepared by another party. On hearsay grounds, the exhibit was not received in evidence, but the record contains Roddewig's testimony relating to it. This testimony reflected that the exhibit assumed private streets and that the 60 single-family lots were to be 25 feet by 100 feet in dimension. On cross-examination, Roddewig was unable to expand on much of the detail of the exhibit because he had not prepared it. Roddewig, however, did estimate that if the property were so developed, it would be worth $1.6 million. He further added, over the Association's objection that intervening uses are irrelevant in zoning cases, that the property was worth $2.9 million if the property were developed for townhouses.

Regarding the value of the property if zoned to permit the proposed development plan, McCann testified that the property was worth $3,236,000. The City presented no evidence whatsoever on this matter and relied instead on the contract price of $1,375,000 as the proper measure of the fair market value for the property if rezoning were to occur. The Association contends that this latter figure is outdated and should be given little weight.

We believe that the above testimony amply supports the conclusion of the circuit court that the zoning classification significantly diminishes the value of the property. Roddewig's testimony that 60 homes can be crammed onto the property is not credible. First, the exhibit upon which that figure is based is not in the record. In addition, Roddewig lacked knowledge on significant aspects of the exhibit, such as the front and rear yard setbacks and whether fire code requirements were met. Second, we believe that the aerial photograph of the area best demonstrates the number of single-family homes that could fit on the property. The photograph shows that only about 40 homes could comfortably fit on the property, not 60 as Roddewig testified. Because Roddewig's testimony overestimates the number of homes that could be built, his opinion as to the property's fair market value as zoned must be reduced. Once reduced, we believe the testimony supports the conclusion that the property's fair market value as zoned is between $800,000 and $1 million, based upon 40 single-family homes.

We also reject the higher value Roddewig suggested based upon the construction of townhomes. This figure assumed a different, less restrictive zoning classification. A plaintiff is not required in a zoning case to disprove the reasonableness of intervening zoning classifications; he need only show the ordinance is unreasonable as applied and that his proposed use is reasonable. (See *Brunette v. County of McHenry* (1977), 48 Ill. App. 3d 396, 398, 363 N.E.2d 122, 123.) Consequently, we need not consider the value the property would have if built with townhomes because such use constitutes an intervening land use, not a use consistent with the current R2 zoning.

Accordingly, we believe that the zoning restriction, at a minimum, diminishes the value of the property by $375,000 to $575,000. This figure would represent the difference between the contract price and the fair market value of the property as zoned. If, as suggested by the Association, the contract price is "stale," the diminution in value enters the "millions of dollars" range found by the circuit court.

The third and fourth *La Salle* factors are frequently considered together. (*Michalek v. Village of Midlothian* (1983), 116 Ill. App. 3d 1021, 1036, 452 N.E.2d 655, 664; *Ward v. County of Cook* (1979), 68 Ill. App. 3d 563, 570-71, 386 N.E.2d 309, 315.) These factors require a court to consider the hardship the restriction imposes on an owner in light of the extent to which the existing zoning promotes the general health, safety and welfare of the public. Only by comparing these two factors can a court determine whether the relative gain to the public outweighs any hardship imposed on the owner. *Michalek*, 116 Ill. App. 3d at 1036, 452 N.E.2d at 664-65.

■■ As to these factors, the circuit court concluded that the City's ordinance did "not promote the health, safety, or general welfare of the public as compared to the hardship to St. Lucas." To support its conclusion, the court noted that the proposed use would increase taxes substantially, create new jobs, increase nearby property values due to convenient shopping, only fractionally increase traffic, and have no adverse impact on nearby residences. It further noted that barring the property from its highest and best use would fail to ensure the future of St. Lucas Cemetery.

The City contends that the circuit court's conclusion ignores the evidence that the plan will adversely affect the values of nearby residential property and the aesthetics of the nearby river and parks. We disagree and believe the record reflects that, relative to the Association's hardship caused by the restriction, the gain to the public due to the zoning restriction is minimal. Furthermore, the record shows the

proposed development will have significant positive effects and minimal, if any, negative effects.

Regarding the harm to the Association caused by the restriction, Richard Schmucker, the Association's chairman and long-time board member, testified that the St. Lucas Cemetery has been operating at a deficit for the last 10 years. He explained that maintenance expenses have consumed the Association's reserves and that income from interments has significantly decreased due to changing family attitudes towards burials.

Schmucker testified that since the late 1950's, the Association knew that the sale of the property would be needed to ensure its future. He noted that St. Lucas Cemetery has a 250-year supply of burial plots and, therefore, it does not need the property for interments. He also stated that the property has been listed with a broker for 20 years, but only two offers have been received. Both offers were contingent upon the property's rezoning. He testified that the sale of the property is essential for the cemetery's continued operation. Reverend David Abrahamson, a pastor connected with the Association, similarly testified that if the sale did not go through, the cemetery would be "finished."

Regarding the plan's negative economic impacts on nearby property values, we believe the record shows that the restriction is not necessary in order to preserve nearby property values. Richard Roddewig, the City's expert appraiser, testified that the plan would adversely impact residential property values by 5% to 10%. He stated that this depreciation would result from the increased traffic caused by the proposed facility and nearby homeowners' fears of future rezoning. We believe the circuit court properly rejected this testimony as being incredible. First, Roddewig admitted that he did not appraise any house. Accordingly, he was unable to quantify in dollars the amount of depreciation for any particular house. Second, Roddewig recognized that the nearest homes are blocks away across either Foster or Pulaski Avenues or are located one-half mile away to the north. These distances alone suggest that no reduction in market value would occur and that any homeowner fear would be ill-founded. Moreover, no homeowners testified that their home values would depreciate, and the Association's evidence on this matter shows that property values would perhaps increase due to the availability of convenient shopping. To be sure, any adverse economic impact on nearby residences would be negligible and could be no more than that which resulted from the construction of the Dominick's facility that the City recently permitted at Lawrence and Pulaski Avenues. This

new facility is located much closer to single-family residences than the proposed facility would ever be.

As for aesthetic considerations, David Mosena, an expert in land planning and current commissioner of city planning, testified for the City that the Chicago River is a natural treasure of the City and that, in conjunction with neighborhood groups, the City makes special efforts whenever possible to enhance the river's recreational opportunities and increase public access to it. Mosena also reviewed an exhibit which reflected how park and residential uses dominate the banks of the river for large areas on either side of the property.

On cross-examination, however, Mosena admitted that the plan would not interfere with any continuous river-edge walkway which neighborhood groups seek to construct. He also admitted that in areas where the river and arterial intersections intersect, the City has recently permitted commercial uses to adjoin the river. He also acknowledged that the small service station located across the street adjoins the river. In light of this cross-examination, and the considerable distance to the nearest residences, we cannot conclude that aesthetic considerations require a different conclusion on this factor from that reached by the circuit court.

As for the proposed development plan's positive benefits, the Association's witnesses testified that convenient shopping as well as temporary and permanent employment would be provided to area residents. Regarding shopping, Patrick Burke, a commercial real estate broker, testified that the City has fewer retail grocery facilities than most other major metropolitan areas in the United States and that the proposed development plan would supply the City with a much needed, modern facility. As for other benefits, plaintiff's experts agreed that commercial use of the proposed site would generate significant sales and real estate taxes for the City.

Focusing on the negative effects of the plan, the record reflects a negligible impact. We note initially that the plan itself is aesthetically appealing. As for its effect on St. Lucas Cemetery, the record reflects that due to its size and the plan's extensive buffering devices, the cemetery's character is not threatened. Reverend Abrahamson, the Association's spiritual leader, so testified. In this regard, the record reflects that nearby the property, the City has permitted commercial uses in a manner which has resulted in the near destruction of the character of cemetery lands which adjoin those commercial uses. This is the situation at the Beth El and Ridgelawn Cemeteries located on Pulaski Avenue, one-half mile north of the property. The Association's plan stands in bitter contrast to that situation.

Regarding the plan's impact on traffic, Gerald Lindgen, an expert traffic engineer, testified that the plan would have a minimal impact on traffic. He noted that Pulaski and Foster Avenues are both arterial streets, with 42,000 vehicles using the intersection daily. During peak hours, the plan would only generate a 4% increase in traffic. The circuit court correctly found this increase insignificant.

Finally, Joseph Zgonia, an expert civil engineer, testified that the plan would meet or exceed the City's requirements as to sewer, fire, and drainage systems, and would present less of a demand as to these elements than would a single-family residential development. In addition, unlike single-family residences, the plan would not further burden the City's public school system.

Accordingly, we believe that the circuit court's findings as to the third and fourth *La Salle* factors are not against the manifest weight of the evidence. The restriction occasions upon the Association significant harm relative to the public's gain and bears little relation to the health, safety, morals or general welfare of the public.

█ The fifth *La Salle* factor we consider is the suitability of the property for zoned purposes and its suitability for the plan. As to this factor, the circuit court concluded that the property was undesirable for residential use. The court noted that the property borders two arterial streets with heavy traffic and that the character of the area is essentially commercial.

The evidence is uncontradicted that the property is physically capable of being built with single-family residences and that such a use would be both consistent with the current zoning and not incompatible with the uses and zoning of surrounding property. Indeed, the Association's witnesses all agreed that 40 single-family homes could be built on the property and that the property has a fair market value as zoned of about $800,000. The law does not require, however, that the subject property be totally unsuitable for the purpose classified; it is sufficient that a substantial decrease in value results from a classification bearing no substantial relation to the public welfare. (*Oak Park Trust & Savings Bank v. Village of Palos Park* (1982), 106 Ill. App. 3d 394, 405-06, 435 N.E.2d 1265, 1272.) We believe this is the situation with the property.

Allen Kracower, an expert land use planner, and Martin Murphy, the former commissioner of planning for the City of Chicago, both testified to the effect that the highest and best use of the property was pursuant to the Association's plan and not as single-family residences or other R2 permitted uses. Safety, noise and air-quality problems due to the proximity of the Foster-Pulaski intersection were

cited to support their testimony that single-family development was inappropriate. They further stated that any such development would be isolated from other residential neighborhoods and would result in another "island" of homes like that now existing at Pulaski and Bryn Mawr Avenues. Such isolation poses safety problems for children attempting to visit friends or when going to school. Moreover, isolation and the small number of homes would prevent a subdivision from developing a residential character, especially here, where most homes would border on either an arterial street or a cemetery.

For the same reasons listed above, Kracower and Murphy stated that the plan, not single-family residences, reflects the highest and best use of the property. The property's isolation, size, nearness to arterial streets, and the extensive buffering provided by the surrounding cemeteries and bordering streets were a few of the factors they cited to support the reasonableness of the plan. In this regard, even the City's witnesses conceded that a less restrictive use on the property would be reasonable.

As for the suitability of the property for the plan, in addition to the highest and best use factors noted above, the record reflects that within the City of Chicago, the corners of arterial intersections are zoned to permit higher intensity, commercial uses, not single-family residential developments. In this regard, the Association's witnesses noted that the City lacks parcels of land bordering on arterial intersections that are large enough to support modern commercial facilities. They noted that subdividing the property to permit multiple residences in this case would result in the same mistake the City just corrected at Lawrence and Pulaski Avenues. There, the City condemned numerous residential properties in order to assemble a tract of land large enough to permit construction of a Dominick's facility.

The record also shows that along Pulaski Avenue, business and commercial zoning dominate. Moreover, if a trend of development exists on this street, it is towards commercialization. True, commercial zoning and uses stop before Gompers Park. The record shows, however, that Gompers Park exists because it contains low-lying, flood-prone lands bordering a river, rather than as a result of a master zoning plan which envisions low intensity uses at or near the property. In summary, we believe that the circuit court properly found that the property is more suitable for the plan than for its zoned purposes.

■ The last *La Salle* factor we consider is the length of time the property has been vacant as zoned considered in the context of land development in the vicinity of the subject property. This factor requires a party to show that his property is vacant or unsalable *be-*

*cause of* the zoning classification. *Oak Park Trust & Savings Bank*, 106 Ill. App. 3d at 406, 435 N.E.2d at 1274-75.

The record shows that the property has been listed for sale by a local real estate brokerage firm since the late 1960's. During this time, the Association received only two purchase offers. The first offer, received in 1978, was withdrawn after the Association was unable to obtain a zoning variance from the City to allow the construction of low-rise multifamily residential buildings on the proposed site. The second offer is the currently pending offer to purchase the property.

Significantly, both offers have been contingent upon a zoning change. While the record does not show how much the property was marketed for its zoned purposes, we believe that the property's failure to sell is a result of more than just a lack of proper marketing by the Association. As previously discussed, the proposed site is not particularly suitable for single-family residential development. Traffic noise, geographic isolation and proximity to a busy intersection and cemeteries are but a few of the factors weighing against single-family development. Moreover, in light of the testimony that residences in this area are highly sought after and that large scale redevelopment is occurring, the failure of the Association to receive even one offer to develop the land residentially makes even more tenable the argument that the property is improperly zoned. Accordingly, the circuit court's conclusions under this *La Salle* factor are not contrary to the manifest weight of the evidence.

In summary, the circuit court's findings of fact under each *La Salle* factor are not contrary to the manifest weight of the evidence. Taken together, we believe that these findings satisfy the Association's burden in this case. In our opinion, the circuit court properly found that the R2 classification assures that the property may never be developed and that the classification bears no substantial relation to the public health, safety or general welfare. Therefore, we affirm the circuit court's conclusion that the City's ordinance is unconstitutional as applied to the Association's property. In addition, based on the foregoing analysis, we affirm the circuit court's conclusion that the Association's proposed use is a reasonable use for the property.

We next focus on the second issue involved in this case: whether the circuit court properly denied the Association's request for "just compensation" pursuant to the takings clause of the Illinois Constitution (Ill. Const. 1970, art. I, §15). The circuit court concluded that no taking occurred because the City's denial of the Association's request for a zoning change occasioned upon the Association only a diminution in value of the property rather than a denial of "all economically via-

ble uses." On appeal, the Association contends that the manifest weight of the evidence showed that there is no market demand for the property as zoned and, even if such demand existed, the "buffer" requirement within the City's ordinance precludes any meaningful residential development of the property. Accordingly, the Association contends that the City's ordinance deprives it of "all economically viable uses" of the property. We disagree.

Initially, we note that the Association's claim for "just compensation" as a result of a temporary taking is based on *First English Evangelical Lutheran Church v. County of Los Angeles* (1987), 482 U.S. 304, 96 L. Ed. 2d 250, 107 S. Ct. 2378. In *First English*, the United States Supreme Court held that where an ordinance operates to deny a landowner "all use" of his property, the owner is entitled to compensation from the taking authority for the duration of the taking. (*First English*, 482 U.S. at 322, 96 L. Ed. 2d at 268, 107 S. Ct. at 2389.) We note, however, that in *First English*, the Court assumed for purposes of its opinion that a taking had occurred in that the owner was denied "all use" of his property. The opinion then proceeded to address the required remedy under Federal constitutional law once a taking is so established. (*First English*, 482 U.S. at 321-22, 96 L. Ed. 2d at 268, 107 S. Ct. at 2389.) Consequently, *First English* does not resolve the issue of whether a taking occurred in this case; it only provides the required remedy under Federal constitutional law if we were to determine that a temporary taking has occurred.

■ ■ In addressing whether a taking has occurred in this case, the issue becomes whether the City's zoning ordinance "goes too far" so as to be deemed a taking. (*Pennsylvania Coal Co. v. Mahon* (1922), 260 U.S. 393, 415, 67 L. Ed. 322, 326, 43 S. Ct. 158, 160.) This issue requires a court to undertake line drawing. Of course, defining where the line is to be drawn is problematic. As the Supreme Court has noted, there is "no set formula to determine where regulation ends and taking begins." (*Goldblatt v. Town of Hempstead* (1962), 369 U.S. 590, 594, 8 L. Ed. 2d 130, 134, 82 S. Ct. 987, 990.) Aggravating this problem is that the courts of this State have acknowledged that our constitution provides greater guarantees to landowners against takings than the parallel guarantee provided under the fifth and fourteenth amendments of the United States Constitution. (See *Rigney v. City of Chicago* (1881), 102 Ill. 64; *Citizens Utilities Co.. v. Metropolitan Sanitary District* (1974), 25 Ill. App. 3d 252, 322 N.E.2d 857.) At some time, a court of this State may be required to address whether, in these regulatory taking cases, the guarantees under our constitu-

tion are coterminous with or more extensive than those provided under the Federal constitution. Because we conclude that, in this case, the ordinance falls far short of a taking as established under Federal constitutional law, we do not undertake that analysis at this time. Accordingly, we focus our attention on Federal constitutional law as it pertains to regulatory takings.

In *Penn Central Transportation Co. v. City of New York* (1978), 438 U.S. 104, 57 L. Ed. 2d 631, 98 S. Ct. 2646, the Court addressed the issue of whether the designation of Grand Central Terminal as a landmark under New York City's Landmarks Preservation Law amounted to a taking under circumstances where this designation operated to deny Penn Central's lessee from constructing a multistory office building over the terminal thereby destroying the historic and aesthetic features of the terminal. In resolving the issue against Penn Central, the Court stated:

> "On this record, we conclude that the application of New York City's Landmarks Law has not effected a 'taking' of appellants' property. The restrictions imposed are substantially related to the promotion of the general welfare and *** permit reasonable beneficial use of the landmark site ***." (*Penn Central*, 438 U.S. at 138, 57 L. Ed. 2d at 657, 98 S. Ct. at 2666.)

In a footnote, the Court emphasized that if at some point in the future, Penn Central could demonstrate that circumstances have so changed that the terminal ceases to be "economically viable," then relief could be obtained. *Penn Central*, 438 U.S. at 138 n.36, 57 L. Ed. 2d at 657 n.36, 98 S. Ct. at 2666 n.36.

Accordingly, under *Penn Central* and its progeny, a regulatory taking occurs when the regulation "denies an owner economically viable use of his land." (*Agins v. Tiburon* (1980), 447 U.S. 255, 260, 65 L. Ed. 2d 106, 112, 100 S. Ct. 2138, 2141; see also Michelman, *Takings, 1987*, 88 Colum. L. Rev. 1600 (1988).) In this case, the City's ordinance did not deny to the Association all economically viable uses of its land. The record reflects that under the R2 classification assigned to the property, the following uses are permitted, among others: (1) single-family detached dwellings; (2) agricultural uses; (3) cemeteries; (4) churches, rectories, parish houses; (5) convents and monasteries; (6) golf courses; (7) home occupations; (8) libraries; (9) day care centers; (10) parks and playgrounds; and (11) schools. Of these permitted uses, the Association only presented evidence on the issue of economic viability as to single-family residences and cemetery uses; no evidence was presented, for example, to the effect that a nursery, as a permitted agricultural use, would not be an economically viable use of

the property. In this regard, we note that the record shows that the one-acre segment of the property which the Association purchased in 1919 contained facilities from which the Association commercially operated a greenhouse and monument business. Both of these operations sold to the public, with the greenhouse business continuing until 1955. Again, nothing in the record demonstrates that the City's ordinance precludes the Association from using the property for this use or any of the other permitted uses under the R2 classification. For this reason, the cases the Association cites are clearly distinguishable. In each of those cases, the ordinance limited the use of the property in such a way as to prohibit the property owner from making *any* use of its property. *Corrigan v. City of Scottsdale* (1986), 149 Ariz. 538, 720 P.2d 513 (property limited to open space uses); *Rippley v. City of Lincoln* (N.D. 1983), 330 N.W.2d 505 (public use zone ordinance); *Sheen v. Evesham Township* (1982), 184 N.J. Super 11, 445 A.2d 46 (woodlands environmental protection zone ordinance); *Burrows v. City of Keene* (N.H. 1981), 432 A.2d 15 (conservation district); *City of Austin v. Teague* (Tex. 1978), 570 S.W.2d 389 (scenic easement).

The conclusion that we have reached is not changed even if we broadly interpret the "buffer" requirement. Once given a broad interpretation, we agree with the Association that the construction of single-family residences would not be possible. Nevertheless, even absent the ability to construct single-family residences, the Association would remain free to develop its property in accordance with the other permitted uses. A different situation would perhaps arise if single-family residences were the only permitted use. In that situation, the "buffer" would deny to the Association economically viable use of the property. Because we are not faced with that situation, we conclude that the circuit court properly concluded that the City's ordinance occasioned upon the Association only a mere diminution in value, rather than a denial of all economically viable use of the property.

For the forgoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.