THOMAS J. LAMBRECHT *et al.*, as Trustees, *et al.*, Plaintiffs-Appellants, v. THE COUNTY OF WILL, Defendant-Appellee (Thomas Reuttiger *et al.*, Intervening Defendants-Appellees).

Third District   No. 3—90—0428

Opinion filed August 20, 1991.

Thomas R. Wilson, of Herschbach, Tracy, Johnson, Bertani & Wilson, of Joliet (Roger D. Rickmon, of counsel), for appellants.

Edward Burmila, Jr., State's Attorney, of Joliet (Judith Z. Kelly, of State's Attorneys Appellate Prosecutor's Office, of counsel), for appellee County of Will.

Richard T. Buck and Michael R. Lucas, both of McKeown, Fitzgerald, Zollner, Buck, Hutchison, & Ruttle, of Joliet, for other appellees.

JUSTICE SLATER delivered the opinion of the court:

This appeal arises out of defendant Will County's denial of a special use permit sought by plaintiffs to allow them to operate a quarry. Plaintiffs Thomas J. Lambrecht and Paul A. Lambrecht, as trustees of the Brown and Lambrecht Earthmovers Inc., Employees Profit Sharing Trust (the Trust) own a 185.44-acre parcel of land (the subject property) located in unincorporated Will County, Illinois. Plaintiff Vulcan Materials Company (Vulcan) is engaged in the business of mining and quarrying and currently operates a quarry (the Chicago Street quarry) located approximately one mile south and east of the subject property. Vulcan has an interest in the subject property as a contract purchaser. The intervening defendants are owners of property adjoining or located near the subject property.

The subject property consists of farmland and is bounded on the south, east, and west by other farms. Immediately north of the property is a single-family residential subdivision containing some older homes and some vacant lots. There are also a number of residential subdivisions to the northeast and northwest, as well as a retirement complex. The property is currently zoned A-1 for agricultural use. The Will County zoning ordinance allows for quarrying under such a classification if a special use permit is obtained. After plaintiffs' application for a special use permit was denied by the county, plaintiffs filed suit for a declaratory judgment alleging that the zoning ordinance was arbitrary and unconstitutional as applied. The circuit court upheld the denial of the special use permit, finding that plaintiffs had not shown that the zoning ordinance was arbitrary, unreasonable and without a substantial relationship to the public health, safety, morals, or general welfare. The sole issue on appeal is whether the judgment of the trial court is contrary to the manifest weight of the evidence. We affirm.

> "[A] zoning ordinance will be upheld if it bears any substantial relationship to the public health, safety, comfort or welfare. An ordinance will be presumed to be valid, and the one attacking

an ordinance bears the burden of demonstrating its invalidity. The challenging party must establish by clear and convincing evidence that the ordinance, as applied, is arbitrary and unreasonable and bears no substantial relation to the public health, safety or welfare." *Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 179-80, 354 N.E.2d 899, 903.

The parties agree that the relevant factors in determining the validity of a zoning ordinance are: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which the destruction of the property values of plaintiff promotes the health, safety, morals, or general welfare of the public; (4) the relative gain to the public as compared to the hardship imposed upon the property owner; (5) the suitability of the subject property for the zoned purposes; and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area. (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65.) Additional considerations include the degree of care which the community has taken to plan its land use development and any evidence of community need for the proposed use. (*Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 167 N.E.2d 406.) No one factor is controlling. *La Salle National Bank*, 12 Ill. 2d 40, 145 N.E.2d 65.

The validity of a zoning ordinance is dependent upon the peculiar facts and circumstances of a given case. (*La Salle National Bank*, 12 Ill. 2d 40, 145 N.E.2d 65), and we will discuss the evidence presented here only as it relates to the factors mentioned above. With regard to the first factor, the trial court found the existing uses of nearby property to be residential and farmland, with the land located north of the property being predominantly residential. Roger Tibble, a real estate appraiser, testified for defendants that the Honey Hill and Green Tree subdivisions are located to the east and northeast of the proposed quarry site. Sugar Creek and Sugar Creek Hills are located to the north and northwest. Preston Heights and Hawthorne Hills are located further to the west and northwest. In addition, there are several residences located north of the property and the Salem Village Nursing Home is located approximately three-quarters of a mile north. The remainder of the land to the east, west, and south is farmland.

Charles Southcomb, plaintiffs' real estate appraiser, testified that the Honey Hill subdivision contains approximately 40 homes with an average value in the mid-$60,000 range. Green Tree subdivision con-

tains approximately 100 homes with the highest value in the $80,000 to $90,000 range. Sugar Creek Hills contains about 40 homes with an average value of $90,000, with some homes valued at up to $150,000. Sugar Creek contains approximately 100 homes on large wooded sites valued at $90,000 to $175,000. Preston Heights, located one-half to one mile from the subject property, contains over 100 homes with a maximum value of $52,000. Hawthorne Hills, located about a mile from the proposed site, contains 30 homes valued at $90,000 to $100,000. The subdivision which abuts the northern property line of the proposed quarry site contains approximately 15 homes with an average value of $40,000 with some as high as $60,000. Although Southcomb did not know how many people lived in the Salem Towers and Salem Village retirement community, he agreed that a couple of hundred people was a fair estimate. He also agreed that the existing uses in the immediate area around the subject property are single-family residential and agricultural.

■ Plaintiffs contend that there is no basis in the record for the trial court's characterization of the land adjacent and to the north of the proposed quarry as predominantly residential. Based on the testimony related above, we believe there was ample evidence to support such a finding.

■ The second factor to be considered is the extent to which property values are diminished by the particular zoning restriction. The trial court found that the value of the subject property was not diminished by the zoning restriction. Defendants' real estate appraiser, Roger Tibble, testified that the property as zoned had a value of $3,000 per acre. Tibble did not state what the value of the property would be if quarrying were permitted. Charles Southcomb testified for plaintiffs that the value of the property was $2,500 per acre as zoned but that it would be worth $12,000 per acre if quarrying were permitted. Since Southcomb's unrebutted testimony shows that the use of the property as a quarry would increase its value by $9,000 to $9,500 per acre, we find that the trial court's determination that the value of the property was not diminished by the zoning restriction is against the manifest weight of the evidence. However, although the court erred in finding that the value of the property was not diminished, this factor is not controlling.

> " 'That the property would be worth more if plaintiffs were free to develop it as they wish is not determinative of the validity of the zoning [citations], as that is true in almost any zoning dispute. The plaintiffs purchased this property fully aware of its zoning status. The financial disadvantage suffered from de-

nial of the petition is a self-created one. [Citation.] That a business risk has been taken by the purchaser is a factor to consider in assessing the economic hardship imposed upon him.' " *Meyer Material Co. v. County of Will* (1977), 51 Ill. App. 3d 821, 828, 366 N.E.2d 1149, 1154, quoting *First National Bank v. City of Springfield* (1976), 42 Ill. App. 3d 566, 569, 356 N.E.2d 367, 370.

As defendants note, in this case any economic hardship visited upon plaintiffs is softened by the terms of the contract between the Trust and Vulcan. The record reveals that the Trust will receive, and Vulcan will pay, little more than the fair market value of the property as it is currently zoned. In addition, either party may terminate the contract if the special use permit is not obtained. More importantly:

"It is not the mere loss of value that is significant. Rather, the loss in value to the plaintiff must be considered in relation to the public welfare. Only when the public welfare does not require the restriction and resulting loss does the loss in value become significant." *La Grange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 309, 388 N.E.2d 388, 391.

Any economic loss to plaintiffs must be evaluated, then, in relation to the third and fourth factors outlined in *La Salle National Bank*. These factors are often considered together and require a court to weigh the effects of the zoning restriction as it promotes the health, safety, morals, or general welfare of the public against the hardship imposed upon the property owner. (*St. Lucas Association v. City of Chicago* (1991), 212 Ill. App. 3d 817, 571 N.E.2d 865.) The evidence adduced at trial relevant to this issue generally related to one of four categories: (1) the impact of the proposed quarry on the value of neighboring property; (2) the effects of blasting done at the quarry; (3) the effect of the quarry on groundwater; and (4) the general compatibility of the quarrying operation with surrounding land uses.

Plaintiffs' real estate appraiser, Charles Southcomb, believed that a quarry would neither diminish nor enhance the value of the surrounding property. He noted that Sugar Creek, Sugar Creek Hills, Preston Heights, and Salem Towers were all within a mile of Vulcan's existing Chicago Street quarry and they were developed after the quarry began operating. In addition, Hawthorne Hills is located across the street from the existing quarry and was also developed subsequent to existing quarrying operations. Southcomb admitted on cross-examination, however, that property in close proximity to the proposed quarry could suffer a diminution in value. Defendants' real estate appraiser, Roger Tibble, testified that the proposed quarry

would have a substantial detrimental effect on established land uses. Tibble used a matched pair analysis, in which sales of property close to an existing quarry were compared with sales of similar property outside the area. Tibble stated that homes within the "impact zone" of the quarry took substantially longer to sell and suffered a significant loss in value compared to homes outside the impact zone. Tibble admitted, however, that other variables could affect the value of a home and that he could not isolate what effect the quarry had versus the other variables.

Two expert witnesses testified for plaintiffs regarding the effects of blasting on neighboring property. Don Froedge stated that in his opinion blasting at the proposed site would not adversely affect the structures in the area. He was unable to say if there would be any damage to personal property such as dishes, however, and he admitted that his definition of damage did not include pictures or plates falling off a wall and breaking. David Glossbrenner testified that blasting at the proposed site would not adversely affect surrounding properties if good blasting practices were followed.

Christopher White, vice-president of Vulcan, testified that Vulcan would comply with county regulations regarding the handling of explosives, blasting, and maximum vibration emissions and that they had done so at the Chicago Street quarry. The county zoning ordinance requires blasting procedures to be designed so that the maximum ground vibration will not exceed 0.5 inches per second of ground particle velocity as recorded at the nearest existing building. While White stated that Vulcan makes a seismographic record of each blast, he acknowledged that the seismograph does not always work and that it is not always placed at the nearest property line. When questioned about various blast records which indicated vibration levels in excess of 0.5, White maintained that they did not necessarily demonstrate that the ordinance had been violated because he was unable to tell where the seismograph had been placed. White also agreed that nearby home owners would be able to hear and feel the blasting and that they might consider it a nuisance.

Gregory Zak, a technical adviser with the Illinois Environmental Protection Agency (the Agency), testified that the Agency received more complaints regarding blasting at the Vulcan operation than at any other quarry in Illinois. Zak stated that in 1980 he installed a seismograph on property bordering on the Chicago Street quarry for approximately six months. The seismograph recorded 52 blasts, 22 of which exceeded 0.5 inches per second of ground particle velocity, including one above 2.0. The seismograph was set to record blasts of

moderate intensity and very low level blasts were not recorded. No complaint was ever filed by the Agency against Vulcan because at that time the Agency had no regulations limiting ground particle vibrations.

Several homeowners living near the Chicago Street quarry testified to cracks in walls and floors of their homes which they believed to be caused by blasting. Some also complained of dust and the presence of "flyrock" on their property. Flyrock is stone which is thrown into the air by blasting.

Both plaintiffs and defendants presented expert testimony regarding the effect of the proposed mining and quarrying operation on the area's water supply. Richard Schowengerdt, a hydrologist, was hired by Vulcan to determine the impact of the proposed quarry. He visited the proposed site and the Chicago Street quarry and reviewed well logs and boring records kept on file with the State. In Schowengerdt's opinion, the proposed quarrying activities would not have a substantial effect on the water supply.

Roberta Jennings, a hydrogeologist, testified for defendants that she reviewed the geology of the area, compiled a well log inventory, and she reviewed Schowengerdt's evaluation. In her opinion, there could be a substantial negative impact on wells near the quarry and some impact to wells farther away. Jennings also believed that the proposed site might intersect with a buried bedrock valley, causing rapid dewatering of wells, but she was unable to pinpoint its location or confirm its existence due to a lack of available data. Jennings was also critical of the methodology and conclusions reached by Schowengerdt. On rebuttal Schowengerdt disagreed with Jennings' opinion regarding the existence of a buried bedrock valley. In addition to the expert testimony presented, two homeowners living near the Chicago Street quarry testified that their wells had gone dry.

Plaintiffs' expert planning consultant, Thomas Murphy, testified that the proposed quarrying operation was compatible with the county land use plan and the surrounding agricultural and residential uses. Murphy thought that a quarry would benefit both the immediate area and the general area south of Joliet. Real estate appraiser Southcomb also opined that a quarry was compatible with the surrounding area. Paul Gorte, director of planning for Will County, stated that he did not believe that the proposed quarry was compatible with the surrounding area. His expectations for the area included further residential development with some possible commercial use at intersections, although he did not foresee any additional development within the next five years. Gorte acknowledged that the county had approved a

residential subdivision across the river from an operating quarry, but he believed that knowingly choosing to live near a quarry was a different situation than allowing a quarry in an existing residential area.

■ The trial court found that allowing the proposed use would detrimentally affect the existing uses of surrounding property, that the public substantially benefits from the zoning restriction, and that no significant hardship was imposed on the plaintiffs. It is well settled that it is the function of the trial court to weigh conflicting testimony and its findings will not be disturbed unless they are contrary to the manifest weight of the evidence. (*La Salle National Bank,* 12 Ill. 2d 40, 145 N.E.2d 65.) While this could fairly be characterized as a close case, we believe that the trial court's findings are sufficiently supported by the evidence. In any event, we do not believe that the opposite conclusion is clearly evident.

■ Plaintiffs argue that the evidence relating to Vulcan's blasting at the Chicago Street quarry is "little more than an improper attempt to defeat plaintiffs' relief by impeaching the character of the plaintiff corporation." We find nothing improper. Plaintiffs presented testimony that Vulcan would follow proper blasting procedures and conform to the county ordinance regarding ground particle velocity and that they had done so in the past. Evidence indicating that Vulcan may have violated the ordinance was clearly relevant to the issue of the believability of such testimony.

Plaintiffs also maintain that Gorte's opinion that a quarry was not compatible with existing residential uses was based solely on his belief that it is improper to locate a quarry near existing homes because doing so destroys the expectations of the homeowners. Plaintiffs then hypothesize that the decision of the county denying the special use permit and the judgment of the trial court were also grounded solely on this basis. Plaintiffs then argue that those decisions were erroneous because "the use of property cannot be restricted or limited merely because neighboring property owners so desire, or because they think it might protect the value of their residences." *Regner v. County of McHenry* (1956), 9 Ill. 2d 577, 582, 138 N.E.2d 545, 547.

■ We agree that restrictions on the use of property cannot be justified by the mere *desires* of neighbors or their *belief* that property values will be affected. However, the diminution of property values within a neighborhood is a proper factor for the trial court to consider. (See *La Grange State Bank,* 75 Ill. 2d at 309, 388 N.E.2d at 391; *Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 382, 402 N.E.2d 719, 727 ("[t]he rights of adjacent and abutting property owners are to be considered").) Moreover,

regardless of the merits of the distinction drawn by Gorte between people who build their homes near existing quarries and those who buy their homes and "then have a quarry put in [their] back yard," there is nothing in the record to suggest that the trial court based its decision on, or was even influenced by, a similar concern.

■ The fifth factor to consider is the suitability of the subject property for the zoned purposes. There is no dispute that the property has been used as a farm and is suitable for that purpose. The limestone deposits beneath the surface and the access to highways and a drainage source also make the property suitable for a quarry. Vulcan's vice-president agreed, however, that similar stone was available farther south and that Vulcan had not explored all possible alternative sites. The trial court made no specific finding with regard to this factor, and we do not believe that it favors either plaintiffs or defendants under the facts of this case.

■ The sixth factor is the length of time the property has been vacant as zoned considered in the context of land development in the area. Defendants note that since the property is zoned for agricultural use and is used for farming it cannot be considered vacant. Plaintiffs point out that there has been no development in the area in a number of years. Paul Gorte, the county planner, stated that he did not expect any development for another 10 to 15 years. We do not believe that this lack of development favors plaintiffs' position, however. A party relying on the vacancy of the subject property must show that the property is vacant, unmarketable, or undeveloped *because* of the zoning classification. (*St. Lucas Association*, 212 Ill. App. 3d at 831-32, 571 N.E.2d at 874; *Amalgamated Trust*, 82 Ill. App. 3d at 384, 402 N.E.2d at 731.)

> "Absent such proof, we would have no more reason to hold the vacancy of the property was occasioned by improper zoning than we would to hold that the vacancy occurred because no attempts were made to use or develop the property, or because other difficulties totally unrelated to zoning had been encountered." *Amalgamated Trust*, 82 Ill. App. 3d at 384, 402 N.E.2d at 731.

Here the land was zoned for agriculture and was being used for that purpose. Under those circumstances, we do not view the lack of development as significant.

■ The next factor to consider is the degree of care which the community has taken to plan its land use development. The record before us contains the land use plan adopted by Will County in 1978. It is a document which, excluding the appendix, exceeds 100 pages of

text, charts, and graphs. Three principal goals are outlined in the plan: (1) the promotion of compact and contiguous urban growth in areas where essential services and facilities are available; (2) the conservation of productive farmland; and (3) the promotion of limited rural development in areas which are not considered to be prime farmland. The plan also contains a series of objectives and policies designed to achieve these primary goals. Among those objectives are promoting the optimum use of mineral resources and discouraging the intrusion of incompatible uses in areas containing natural resources.

Although the land use plan is lengthy and fairly detailed, its limitations are obvious when it is applied to a situation such as the one presented in this case. Denial of the special use permit is consistent with the goal of conserving productive farmland but is inconsistent with making use of the available mineral resources. We find, therefore, that this factor favors neither plaintiffs nor defendants.

■ The final factor to consider is the community need for the proposed use. Vulcan's vice-president, Christopher White, testified that Vulcan's Chicago Street quarry produces and sells approximately one million tons of material per year. The proposed quarry is intended to replace the existing quarry, which is two to four years from exhaustion. In White's opinion, if the proposed quarry was not approved, it would be very difficult for other quarries in the area to meet the demand for quarry products after the Chicago Street quarry ceased operation. White later stated that competitors would supply the lost production, but prices would rise $3 to $4 dollars per ton.

On cross-examination, White agreed that the market area for a quarry generally includes areas within a 15- to 20-mile radius. White then testified that a competitor's quarry was within 15 to 18 miles of the Chicago Street quarry, and he also identified three other quarries within 20 to 25 miles.

We find that the evidence demonstrates some need for the proposed quarry and therefore weighs in plaintiffs' favor. It is clear, however, that the community need for a quarry is not a compelling one given the existence of similar operations in the area. Under the circumstances, we can assign only minimal weight to this factor.

Our review of the relevant factors indicates that the trial court's decision was not erroneous.

> "[Z]oning is primarily a legislative function, subject to court review only for the purpose of determining whether the power, as exercised, involves an undue invasion of private constitutional rights without a reasonable justification in relation to the public welfare. [Citations.] Where it appears, from all the facts, that

room exists for a difference of opinion concerning the reasonableness of a classification, the legislative judgment must be conclusive." (*La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 428, 312 N.E.2d 625.) Given the evidence of the incompatibility of a quarry operation with surrounding land uses, the potential effect on the groundwater supply, the effects of blasting on nearby property, and the impact on the value of neighboring property, we agree with the trial court that plaintiffs have not proved by clear and convincing evidence that denial of the special use permit was arbitrary, unreasonable, and without a substantial relationship to the public health, safety, or general welfare. *Cf. Meyer Material Co. v. County of Will* (1977), 51 Ill. App. 3d 821, 366 N.E.2d 1149.

For the reasons stated above, the judgment of the circuit court is affirmed.

Affirmed.

STOUDER, P.J., and McCUSKEY, J., concur.